RUSSELL MOTOR CAR COMPANY *v.* UNITED STATES.

FREYGANG ET AL., PARTNERS DOING BUSINESS UNDER THE NAME OF MIDLAND BRIDGE COMPANY *v.* UNITED STATES.

ALBERT & J. M. ANDERSON MANUFACTURING COMPANY *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 485, 480, 740. Argued March 6, 1923.—Decided April 9, 1923.

1. The Act of June 15, 1917, c. 29, 40 Stat. 182, empowered the President, within the limits of amounts appropriated, " to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material," and to exercise the authority " through such agency or agencies as he shall determine from time to time," " material " being defined as including stores, supplies and equipment for ships and everything required for or in connection with the production thereof.

*Held:* (*a*) The word "material" included anti-aircraft gun-mounts for the Navy.   P. 518.

(*b*) The power "to modify, suspend, cancel, or requisition," any contract, etc., extends to the cancelation of the Government's own contracts.   P. 519.

(*c*) An executive order delegating power under this clause in sweeping terms to the Secretary of the Navy, should be construed broadly, and included the power to cancel government contracts. P. 523.

(*d*) An order of the Secretary canceling a contract need not refer to the statute.   *Id.*

(*e*) The just compensation to which a party is entitled, upon cancelation of his contract under the statute, does not include anticipated profits.   *Id.*

2. The maxim *noscitur a sociis* is used only to solve ambiguity. Verbs in an enumeration whose meaning, when they are separately applied to their common object, is plain, should be interpreted distributively.   P. 519.

3. Where the meaning of a statute may be ascertained without extrinsic aid, debates in Congress will not be considered.   P. 522.

57 Ct. Clms. 464, 244 and 626, affirmed.

APPEALS from three judgments of the Court of Claims fixing just compensation for the cancelation of claimants' contracts with the Government.   In the first and third cases the contracts for the manufacture of anti-aircraft gun carriages, and brass shell cases, were entered into through the Navy Department and were canceled by the Secretary of the Navy, by authority delegated under the Act of June 15, 1917.   In the second case (No. 480) the contract was with the Emergency Fleet Corporation, for the construction of barges, and was canceled through that agency, under like authority.

*Mr. Lyman M. Bass* for appellant in No. 485.

*Mr. George A. King, Mr. William B. King* and *Mr. George R. Shields,* for appellants in No. 480, submitted.

*Mr. Chapman W. Maupin* and *Mr. Arthur H. Russell,* for appellant in No. 740, submitted.

*Mr. Solicitor General Beck,* with whom *Mr. Assistant Attorney General Lovett, Mr. Alfred A. Wheat* and *Mr. Alexander H. McCormick,* Special Assistants to the Attorney General, were on the briefs, for the United States.

*Mr. Louis Titus,* by leave of court, filed a brief as *amicus curiae* in No. 485.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These cases, here on appeal from the Court of Claims, differ in details of fact, but are controlled by the same principles of law and depend alike upon the construction and application of the same statutory provisions.

The salient facts in the case of the Motor Car Company are as follows: That company, on May 14, 1918, entered into a contract, numbered 1498, with the United States, acting through the Secretary of the Navy, to make two hundred and fifty anti-air-craft gun mounts, at an agreed price of $7,860 each, to be delivered at stipulated periods, the last being the sixty days ending April 30, 1919.

Prior to the making of the foregoing contract, viz: in November, 1917, a similar contract, numbered 949, had been entered into by the same parties, the last period for delivery being the sixty days ending January 15, 1919. The actual work under contract 949 was begun about March, 1918; and some time later, and after the making of contract 1498, at the request of the company, the Secretary consented to allow all shipments of mounts to be applied upon contract 949 until its completion. Deliveries under that contract were finished in June, 1919.

On November 18, 1918, the Navy Department expressed a desire that the manufacture of gun mounts under both contracts be greatly decreased and that the company resume production of peace time products as soon as possible " so that a minimum of economic dis-

turbance will be felt during the transition." In its communication the Navy Department requested that immediate arrangements be made for the reduction and eventual stoppage of production of materials under these contracts and the substitution therefor of commercial products, and that the company "initiate preparations for cancellation along the lines indicated." On November 23, 1918, the company was notified that the Secretary had authorized the cancellation of contract 1498, directed to cease work in connection therewith not later than December 2, 1918, and informed that a just and fair settlement would be made as provided by contract and in accordance with the statute covering such cases. Extended negotiations followed in an effort to bring about a settlement and the Secretary finally fixed the sum of $444,847.68 as just compensation for the cancellation of the contract. Seventy-five per cent. of this amount was paid and accepted by the company expressly without prejudice to its rights.

The Court of Claims, after hearing the case, found that just compensation for the cancellation of the contract was the sum of $495,250.34, which amount included a number of elements and items not necessary to be set forth. The court further found that if the company had been permitted to complete the contract according to its terms it could and would have earned a profit, in round figures, of $960,000, but held that the action of the Secretary of the Navy in cancelling the contract was within the authority conferred by the statute, presently to be mentioned, and that the company consequently was not entitled to an award including anticipated profits.

The statute upon which this determination rested was the Act of June 15, 1917, c. 29, 40 Stat. 182, making deficiency appropriations for the military and naval establishments on account of war expenses, and for other purposes. This act contained a provision, authorizing and

empowering the President, within the limits of the amounts appropriated ". . . (b) to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material." The President was authorized to exercise the authority conferred upon him by the act and expend the money therein and thereafter appropriated " through such agency or agencies as he shall determine from time to time." The authority so far as it concerned the Navy, was by him delegated to the Secretary of the Navy in an order dated August 21, 1917, " in so far as applicable to and in furtherance of the construction of vessels for the use of the Navy and of contracts for the construction of such vessels, and the completion thereof, and all powers and authority applicable to and in furtherance of the production, purchase and requisitioning of materials for construction of vessels for the Navy and for war materials, equipment, and munitions required for the use of the Navy, and the more economical and expeditious delivery thereof." The word " material ", the act provided, should include stores, supplies and equipment for ships and everything required for or in connection with the production thereof, and in our opinion included the articles contracted for in this as well as in the other two cases. The act provided that whenever the United States should cancel, modify, suspend, or requisition any contract just compensation should be made therefor to be determined by the President. If the amount so determined should be unsatisfactory the person entitled to receive it could accept seventy-five per cent. thereof and bring suit to recover such further sum as added to the seventy-five per cent. would make just compensation. By the terms of the act the authority granted to the President or delegated by him was to " cease six months after a final treaty of peace is proclaimed between this Government and the German Empire."

The Motor Car Company contends that subdivision (b) of the statute above quoted applies to private contracts alone and affords no authority for the cancellation by the Government of its own contracts. The Court of Claims held otherwise and whether its holding or the company's contention is correct presents the principal question for our consideration.

It must be apparent, we think, that the words of the provision, "*any* existing or future contract," read with literal exactness, include all contracts, whether private or governmental. But it is pointed out that the power to "requisition" cannot apply to a governmental contract; and this may be conceded, since the Government cannot requisition what it already has. Then it is said that inasmuch as the application of the word "requisition" must be confined to private contracts, the other words associated with it must be likewise restricted by virtue of the maxim *Noscitur a sociis.* That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association. Rules of statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place, as this Court has many times held, except in the domain of ambiguity. *Hamilton* v. *Rathbone,* 175 U. S. 414, 421; *United States* v. *Barnes,* 222 U. S. 513, 518–519. They may not be used to create but only to remove doubt. *Id.* Moreover, in cases of ambiguity the rule here relied upon is not exclusive. The problem may be submitted to all appropriate and reasonable tests, of which *Noscitur a sociis* is one. Here we have one word which it may be conceded applies only to private contracts, but the other three words standing alone, it likewise must be conceded, naturally apply to governmental contracts as well. Indeed, they more naturally apply to such contracts. The

power to modify the obligations of a private contract is, to say the least, a most unusual one for governmental exercise. To modify a contract is in effect to make a new one, and it puts something of a strain on our conception of the functions of government to concede its power to make contracts between private parties to which neither may assent and which, consequently, neither will be bound to perform.

We do not mean to deny the power of Congress, in time of war, to authorize the President to modify private contracts (leaving the parties free, as between themselves, to accept or not), nor do we suggest that Congress has not done so by the present statute; but the contention here is not that the power in question extends to private contracts but that it is limited to them. This cannot be conceded. The meaning of the four predicate words is not doubtful;—in that respect, as well as in their operative scope, they obviously differ from one another. The question we are called upon to answer is whether, because the words " *any* . . . contract " must be given a narrower meaning when qualified by the predicate " requisition," their meaning must be limited in like manner when qualified by one of the other three predicates. *Noscitur a sociis* is a well established and useful rule of construction where words are of obscure or doubtful meaning; and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words. *Virginia* v. *Tennessee,* 148 U. S. 503, 519; *Benson* v. *Chicago, etc., Ry. Co.,* 75 Minn. 163. But here the meaning of the words considered severally is not in doubt, and the rule is invoked not to remove an obscurity but to import one. There is nothing in the rule or in the statute which requires us to assimilate the words " modify " and " cancel " to the scope of the word " requisition," simply because the latter has a necessarily narrower application. The

meaning of the several words, standing apart, being perfectly plain, what should be done is to apply them distributively, *diverso intuitu,* giving to each its natural value and appropriate scope when read in connection with the object (any contract) which they are severally meant to control. Thus, the predicate "requisition" will be limited to private contracts, while the other words may be appropriately extended to include governmental contracts as well. An illustration is afforded by the Commerce Clause of the Constitution. The power to regulate interstate and foreign commerce is found in the same clause and conferred by the same words, but the scope of the power when applied to the former may be narrower than when applied to the latter. *Groves* v. *Slaughter,* 15 Pet. 449, 505.

This disposition of the question also accords with the broad purposes of the legislation. When the act was passed we were in the midst of a great war, which called for the utilization of all our resources. The necessities were great, beyond the power of statement. The Government was confronted with the vital necessity not only of producing ships and supplies in unprecedented quantities but of producing them with the utmost haste. Hence it was necessary that everything which stood in the way of or hindered such production should be put aside. But this was a necessity which Congress, of course, realized must sooner or later come to an end, suddenly and completely. With the termination of the war the continued production of war supplies would become not only unnecessary but wasteful. Not to provide, therefore, for the cessation of this production when the need for it had passed would have been a distinct neglect of the public interest. The situation, it is plain, required that production should proceed while the war lasted to the utmost limit of the Nation's power, but that it should come to an end as soon as possible upon the passing of the emer-

gency. In the light of these circumstances, it is not un-
reasonable to regard the statute now under consideration
as intended to accomplish both results, that is: (1) to
enable the President, during the emergency, to utilize his
powers over contracts to stimulate production to the
utmost, and then, (2) upon the passing of the emergency,
to enable him to utilize these same powers to stop that
production as quickly as possible. To the latter accom-
plishment authority to modify and cancel government war
contracts would contribute most effectively. These con-
siderations lend support to the judgment of the court
below construing the statute as having this effect.

In this connection it is not without significance that
the authority granted to the President was to cease six
months after a final treaty of peace. Obviously, the
powers granted to him—among them to modify and cancel
contracts—were to continue during the six months' period
not for the purpose of forwarding war production but, on
the contrary, for the purpose of stopping it. To that end,
we conclude, he was authorized to cancel the Govern-
ment's own contracts such as the one here involved, upon
making just compensation to the parties concerned.

We are referred to the utterances of certain members
of Congress in debate, which it is argued show that the
provision under consideration was meant to cover private
contracts. Whether they come within the rule forbidding
resort to legislative debates, *Lapina* v. *Williams*, 232 U. S.
78, 90; *Omaha & Council Bluffs Street Ry. Co.* v. *Inter-
state Commerce Commission*, 230 U. S. 324, 333; *Stand-
ard Oil Co.* v. *United States*, 221 U. S. 1, 50; *United States*
v. *Trans-Missouri Freight Association*, 166 U. S. 290, 318,
or within the exception, *Wisconsin Railroad Commission*
v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563,
588, we need not consider, since, for reasons already stated,
extrinsic aid for ascertaining the meaning of the language
here under review is not required. Besides, though they

may tend to show that the statute was meant to apply to private contracts, these utterances do not justify the conclusion that the statute was not meant to apply to governmental contracts also.

Certain other contentions of the Car Company may be briefly disposed of. In the first place, it is said that the President did not delegate his power respecting contracts to the Secretary of the Navy, and it is suggested that that officer did not in fact pretend to cancel this contract under the statute. The order of the President delegating his authority to the Secretary is in sweeping terms and it is impossible to conclude otherwise than that it was intended to cover the whole field of power in so far as it pertained to the Navy. Executive power, in the main, must of necessity be exercised by the President through the various departments. These departments constitute his peculiar and intimate agencies and in devolving authority upon them meticulous precision of language is neither expected nor required. In cancelling the contract it was not necessary that the statute should be expressly referred to. It was public law of which everyone was bound to take notice.

It is contended, further, that even if the action of the Secretary of the Navy was warranted by the statute the Car Company was nevertheless entitled to have included as just compensation its anticipated profits.

This contention confuses the measure of damages for breach of contract with the rule of just compensation for the lawful taking of property by the power of eminent domain. In fixing just compensation the court must consider the value of the contract at the time of its cancellation, not what it would have produced by way of profits for the Car Company if it had been fully performed. It is evident that no prudent person, desiring to acquire this contract, would have paid for it the full amount which could be realized upon completion, leaving no chance of

return to himself upon the investment or for the risk and labor incident to its performance. The contract, we must assume, was entered into with the prospect of its cancellation in view, since the statute was binding and must be read into the contract. The possible loss of profits, therefore, must be regarded as within the contemplation of the parties. The lower court was right in refusing to allow anticipated profits and, there being nothing in the findings to justify the contrary, we must accept the amount fixed on the basis of just compensation as adequate.

Our attention is directed to the fact that prior to the cancellation of contract No. 1498, the Car Company had manufactured twenty-five mounts, which it would have delivered under that contract except for the fact that they were made applicable to the former contract, No. 949; and it is insisted that the profit which the Car Company would have made upon these mounts should have been included in the amount of its compensation in any event. It is sufficient to say that the Car Company was permitted to deliver these mounts under its former contract at its own request. Presumably the full contract price therefor was paid in the adjustment of that contract.

It is unnecessary to burden this opinion with a statement of the facts in the Freygang and Anderson Manufacturing Company cases. They are not differentiated in any essential respect from the case of the Motor Car Company and are governed by the same reasons and conclusions.

The judgments of the Court of Claims are severally

*Affirmed.*