POLAROID CORPORATION, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5622.

United States Court of Appeals
First Circuit.

Heard April 5, 1960.

Decided May 3, 1960.

**150**

Isaac M. Barnett, New York City, with whom Julius Silver and Silver, Saperstein & Barnett, New York City, were on the brief, for petitioner.

Norman H. Wolfe, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and Harry Marselli, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is a petition by Polaroid Corporation, hereinafter called taxpayer, to review a decision of the Tax Court holding that certain income received during the years 1951, 1952 and 1953 did not constitute "abnormal income" within the meaning of § 456(a) (2), Internal Revenue Code of 1939, 64 Stat. 1186 (1951), so as to qualify for the relief provided therein from the Korean War excess profits tax.[1] The taxpayer also contests a ruling that, in computing its net abnormal income for 1951 under § 456(a) (3) of the Int.Rev.Code of 1939, the interest with which it was credited in 1951 upon its successful claim for an excess profits tax refund for the years 1942 and 1943 must be reduced by the interest it was charged on income tax deficiencies which resulted from the reduced excess profits tax. All facts were stipulated, and the only questions are of law.

Turning to the first issue, it appears that taxpayer was incorporated in 1937. In argument before this court it described itself as "a discovery company," exclusively engaged in exploiting its own discoveries. Edwin H. Land, its President and Director of Research, is internationally known for inventions in the optical and photographic fields, perhaps the most notable of which is the Polaroid Land Camera and film, income from the manufacture and sale of which constitutes the principal matter herein involved.[2] The camera and film together

---

1. Excess Profits Tax Act of 1950, 64 Stat. 1137 (1951), which, with later additions, was classified as §§ 430–474, Int.Rev.Code of 1939, 26 U.S.C.A. Excess Profits Taxes, §§ 430–474, and is referred to hereinafter as the KW Act.

2. Also involved is income from sales of taxpayer's synthetic light polarizer for 3–D motion pictures. The parties agree the issues are the same, and that this matter need not be separately considered.

(they cannot be used separately) are termed by taxpayer the Polaroid Land process. This process is unique in that it enables any user to develop his own pictures and obtain positive prints anywhere, sixty seconds after exposure. Taxpayer describes this process as a "revolutionary discovery." We shall regard that characterization as accurate. Because of numerous patents, taxpayer has no competitors. The result has been a very substantial return of income.

Taxpayer, under Land's direction, started to develop its process in 1944. Much expenditure of time and money was required before its satisfactory achievement in 1947. Unfortunately for taxpayer, large scale production and commercial success coincided with the Korean War years, as a consequence of which income attributable in part to activities in earlier years fell within the provisions of the KW Act. The Act contains several relief provisions. Taxpayer asserts that one in particular is applicable. The Commissioner has disagreed, and the Tax Court has sustained him.

Under the provisions of § 456 of the KW Act, income is regarded as "abnormal income," and as such is relieved from the full incidence of the excess profits provisions by reallocation to other tax years, if it falls into certain specified "classes," and meets certain additional requirements which were here concededly met. The principal issue here is whether the income falls within that class described in § 456(a) (2) (B): "Income resulting from exploration, discovery or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; * *." [3] Taxpayer asserts that the word "discovery" is broad enough to encompass its process. The government contends that in the context of the Act it relates only to discovery of coal, oil, gas and other natural resources. It bases this in part upon internal evidence, and in part upon legislative history.

■ Starting with subparagraph (B), standing alone, we note that the word "discovery" admits of so many meanings that some interpretation is called for.[4] The possibility of a num-

---

**3.** The relevant portions of § 456(a) are as follows:

"(a) Definitions. For the purposes of this section—

"(1) Abnormal income. The term 'abnormal income' means income of any class described in paragraph (2) * * * if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years * *.

"(2) Separate classes of income. Each of the following subparagraphs shall be held to describe a separate class of income:

"(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

"(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; or

"(C) Income from the sale of patents, formulae, or processes, or any combina-

tion of the foregoing, developed over a period of more than 12 months; or

"(D) Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's method of accounting.

"All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary."

**4.** According to Webster's New International Dictionary (Second Edition, Unabridged) it includes, "1. * * * Finding out or ascertaining something previously unknown or unrecognized; * *." One of these meanings, which we will come to later, is "5. *Mining.* The original finding of part of a vein or lode. It is a prime requisite in the valid location of a mining claim."

ber of meanings for one word is a species of ambiguity. We then observe that the word is not isolated, but is sandwiched between the words "exploration" and "prospecting." The government, accordingly, invokes the doctrine of *noscitur a sociis*. In case of ambiguity this is an "appropriate and reasonable," though not always determinative test. Russell Motor Car Co. v. United States, 1923, 261 U.S. 514, 519, 43 S.Ct. 428, 430, 67 L.Ed. 778. On a proper occasion "such association justifies, if it does not imperatively require," the application of a restricted meaning. Neal v. Clark, 1877, 95 U.S. 704, 709, 24 L.Ed. 586. It is particularly appropriate where one meaning of each of the grouped words has a readily apparent common denominator. Thus the words "barrel," "lock" and "stock" have each, individually, a number of quite different meanings. But if used in the phrase, "lock, stock and barrel" there could be little difficulty in determining which particular one of the several meanings was intended. The word "discovery" is clearly identified with the mining industry. See note 4, supra. So also are "exploration" and "prospecting." Accordingly we find a

consistent, integrated unit, each portion of which casts light upon the other.[5]

■ Taxpayer makes no response to this (other than that set forth in the footnote), except a bare statement that the doctrine of *noscitur a sociis* is inapplicable. Its position is that since the dictionary permits it, "discovery" must be taken to comprehend inventions, or at least major "basic" inventions. If "discovery" is to have that breadth of meaning we could not accept any distinction based upon degrees of invention.[6] While we agree that basic inventions can be described as discoveries, so may any invention, no matter how minor, if it is of sufficient consequence to be entitled to a patent. Cf. United States Constitution, Art. I, § 8, Cl. 8; 35 U.S.C. §§ 100(a), 101. If the word "discovery" is to be taken as broad enough to include inventions, we see no reason for including some and excluding others. We are normally reluctant to adopt a construction of a taxing statute which would create difficult administrative problems.[7] We are entirely unwilling to do so here where the act makes no suggestion of any standard.[8]

5. Taxpayer counters by suggestng that by restricting all three words to mining there would be redundancy. That is not so. *"Discovery"* in this connection has already been defined. See note 4, supra. In the Encyclopedia Britannica (11th ed. 1911), in an article on Mining, is found the following: "Mining * * * The term is not limited to [coal and ore deposits] * * * but includes * * * operations for oil, natural gas or brine * * *. *Prospecting* * * * The work of prospecting is usually left to adventurous men * * *. The prospector is guided in his search by a knowledge of the geological conditions [etc.] * * *. *Exploratory Work* * * * Exploratory work is associated intimately both with prospecting and with development, but the purpose is quite distinct from either prospecting, development or working, and it is of importance that this should be clearly recognized * * *." (We quote the 11th edition of the Encyclopedia both because of its authoritative character, and because it was current when the words "exploration,

discovery and prospecting" first appeared in the taxing statutes. See infra.)

6. It seems peculiarly inappropriate that a person in taxpayer's position should be the one to attempt a distinction between original invention and subsequent minor improvements. Taxpayer possessed over a hundred patents related to the development of its process. How is one to distinguish between that part of income attributable to the original, basic invention, and that attributable to subsequent minor ones? This matter is, in a sense, moot in this case, because the parties have stipulated the amount of the tax. However, the problems it suggests are important.

7. As will be discussed later, certain changes were made in the KW Act over its World War II (WW II) counterpart for the express purpose of avoiding such problems.

8. In G. D. Searle & Co. v. Jarecki, 7 Cir., 1960, 274 F.2d 129, 131, a case seemingly on all fours with this one, except

However, there is an equally serious difficulty if "discovery" is to include all processes and patented inventions. What, then, is the purpose of subparagraph (C), "Income from the sale of patents, formulae, or processes," of § 456(a) (2)? See, supra, note 3. True, that subparagraph relates only to income from the *sale* of the patent or process. But subparagraph (B) relates to *all* income. If "discovery" in subparagraph (B) includes inventions, what is the role of subparagraph (C)? If there is a big hole in the fence for the big cat, need there be a small hole for the small one?

The existence of subparagraph (C) casts further light upon the intended meaning and scope of subparagraph (B). Suppose that instead of manufacturing under its patents, taxpayer had licensed its process to others. Would it be contended that the royalties could be claimed as abnormal income under subparagraph (B), although admittedly, should there be a sale of the process, the proceeds would fall under subparagraph (C)? Rather, it seems more reasonable to hold that Congress, having specifically provided for sales, did not intend by some more general clause to cover income of a similar nature but of less magnitude, i. e., income from a single year's use. There is an even more compelling argument. It is to be noted that § 456 does not group together all sources of abnormal income, but is constructed so that the income-percentage requirements

must be separately applied as to each classification or group. In determining whether, for example, abnormal income resulting from a judgment (A) is of sufficient size to qualify for relief, it is not possible to take into account abnormal income from prospecting (B). There could be no purpose to this unless each classification or group was intended to have some homogeneity within itself. This is an additional reason for applying the doctrine of *noscitur a sociis* within each group, and at the same time for differentiating one group from another. Taking the statute as a whole, we cannot accept the contention that subparagraph (B) was intended to encompass taxpayer's manufacturing income resulting from its process. On the contrary, we think it clear that "discovery" as used in that subparagraph relates to the mining industries, and to nothing else.

Ordinarily we would stop here, but since the opposite conclusion was reached in G. D. Searle & Co. v. Jarecki, 7 Cir., 1960, 274 F.2d 129, supra note 8, we will deal briefly with the legislative history to which the government has devoted its brief. This history falls into two parts; the use since 1918 of the words "exploration," "discovery," and "prospecting" in conjunction, solely with relation to the mining industry, and the particular changes effected by the KW Act over its predecessor, the World War II Act.[9] In Title III, "War-Profits and Excess-Profits Tax," of the Revenue Act

that it came up on the granting of the government's motion for summary judgment of dismissal, the taxpayer claimed as abnormal income under the KW Act income from sales of certain ethical drugs. It was agreed that prior to the time taxpayer had developed and patented the formulae such compounds had never been in existence, and that they had had enormous commercial success. The court said, "The common accepted meaning of the word 'discovery' includes 'Finding out or ascertaining something previously unknown or unrecognized; as Curie's *discovery* of radium' (Webster's New International Dictionary (Unabridged 2d ed.) p. 745)." Then, cautioning that it was not "indicating any expression of opinion on the factual issue," it remand-

ed the case to the district court to determine whether these drugs were "actually discoveries" within that definition. In view of the facts already established with relation to these drugs, we are less then clear by what tests the district court is to resolve this question, or how, in general, the Commissioner is to distinguish those patentable inventions which are discoveries from those which are not.

9. Excess Profits Tax Act of 1940, c. 757, 54 Stat. 975, which, together with later additions and amendments, was classified as §§ 710–784, Int.Rev.Code of 1939, 26 U.S.C.A. Excess Profits Taxes, §§ 710–784, and is hereinafter referred to as the WW II Act.

of 1918, c. 18, 40 Stat. 1057 (1919), we find a limit placed on the excess profits tax that could be imposed on the proceeds from "a bona fide sale of mines, oil or gas wells, * * * where the principal value of the property has been demonstrated by prospecting or exploration and discovery work done by the taxpayer * * *." Section 337, 40 Stat. 1096. An identical provision in the income tax portion of the statute, § 211(b), 40 Stat. 1064, limited the surtax upon such income in the case of individual taxpayers. Congressional history discloses that these provisions were designed to encourage the search for oil and ore deposits during wartime, and to offset the unfairness of taxing in a single year income which was possibly the result of many unprofitable years of prior search. See S.Rep. No. 617, 65th Cong., 3d Sess. 6 (1918) (1939—1 Cum.Bull. (Part 2) 117, 120–21). They were repeated in the income tax and the excess profits tax titles of the Revenue Act of 1921, c. 136, §§ 211(b), 337, 42 Stat. 237, 277. There was no further excess profits taxation until 1940, but these words continued to appear in the income tax statutes, with one exception,[10] until excess profits tax imposition returned with World War II. By that time, in the light of this repeated and almost continuous application to the mining industry (and no other), we think that these words had become well-recognized words of art.

The World War II excess profits tax act exhibits a major schematic change from the earlier acts, but again we find the words "exploration," "prospecting," and "discovery" used together in a relief provision. The here relevant portion (noticeably similar, as will be seen, to

§ 456 of the KW Act) was § 721(a) (2) (C):[11] "Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; * *." Discussion on the floor of Congress indicates that the mining industry was intended as one of the primary beneficiaries of this relief. See, e. g., 86 Cong. Rec. 12174–77, 12350, 12919 (1940); 87 Cong.Rec. 1636 (1941). With the Korean War enactment, subparagraph (C) of § 721(a) (2) was split in two. It is interesting to note the form of this division. The words "exploration, discovery, prospecting" were taken as one group, and placed in subparagraph (B) of the new law, while "patents, formulae, or processes" were placed together in subparagraph (C), and at the same time the words "research, or development of tangible property" were dropped. These changes "redefined and restricted" the types of income to which this special treatment was to be afforded. H.R.Rep. No. 3142, 81st Cong., 2d Sess. 63 (1950) (1951—1 Cum.Bull. 187, 231), U.S.Code Cong.Service 1950, p. 4093. The House and Senate reports described the excised portion as a "potential loophole of major dimensions," and stated that it was being omitted "because there appeared to be no means of restricting such an adjustment to truly meritorious cases other than by the introduction of a large degree of administrative discretion of the type required by the general relief clause of the World War II law (section 722), and because the need for a reallocation of such income seemed to be materially less than in the other classes

10. The single exceptions is the Revenue Act of 1934, c. 277, 48 Stat. 680. When the provision was revived in the Revenue Act of 1936, c. 690, § 105, 49 Stat. 1678, the phrase in question was changed to "prospecting or exploration or [instead of "and"] discovery work," and the section as a whole was limited to oil or gas property. In this form it was carried into the Internal Revenue Code of 1939, c. 2, § 105, 53 Stat. 36, 26 U.S.C.A. § 105

(now § 632 of the Int.Rev.Code of 1954, 26 U.S.C.A. § 632).

11. Excess Profits Tax Act of 1940, c. 757, § 201, 54 Stat. 986, as amended, Excess Profits Tax Amendments of 1941, c. 10, § 5, 55 Stat. 21. Subparagraph (C) of the amended act was derived from, and is practically identical to, subsection (c) of the original § 721.

of income described * * *." Id. at 13 (1951—1 Cum.Bull. at 195); S.Rep. No. 2679, 81st Cong., 2d Sess. 14 (1950) (1951—1 Cum.Bull. 240, 249), U.S.Code Cong.Service 1950, pp. 4040, 4128. Thus even "meritorious cases" that would have come under this now excluded phrase were deliberately sacrificed in the interest of administrative simplification.[12]

In the face of this history, it would be difficult for us to feel that there was introduced into the newly created subparagraph (B) with the word "discovery" a scope of meaning which would include manufacturer's profits from inventions, whether those inventions were revolutionary, or otherwise. Taken in conjunction with internal evidence within the statute itself, we find it impossible.

■■■ We turn next to taxpayer's contention that even if it is not entitled to classify the income in question as "discovery" income under § 456(a) (2) (B), it is nonetheless entitled to relief under the last sentence of subsection (a) (2). This reads, "The classification of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary." Note 3, supra. The relevant regulations are set forth below.[13] We agree with taxpayer that this sentence may be taken as giving the Secretary the authority to accept classifications outside of the express provisions of subparagraphs (A)–(D). But the language is permissive, and we have found nothing in the historical background indicating that the Secretary's role in agreeing to additional classifications was to be one of obligation rather than of discretion. We therefore reject any contention that the Secretary, or Commissioner, was required to grant relief on the basis of a classification suggested by a taxpayer merely because the taxpayer has income which meets the other tests of abnormality. Nor do the regulations themselves assist the taxpayer. First, any classification by a taxpayer is "subject to approval by the Commissioner," and such approval was not given here. Secondly, under this regulation the classification must be "similar to those specified in subparagraphs (A)–(D) * *." If "discovery" relates to mining and natural resources, taxpayer's classification is not "similar." It may be similar (if in fact it is not completely described by the phrase) to "research or development," but the regulations, in accord with the legislative history already discussed, specifically state that income of this class is not subject to relief. The last sentence of the regulations, on which taxpayer places great emphasis, furnishes it no support. That sentence merely provides that income otherwise properly includible within a class is not to be excluded merely because it happens to constitute income from research and devel-

12. In this connection it is to be noted that it was stipulated that taxpayer's income from its process was "income from the sales of tangible property arising out of research and development which extended over a period of more than 12 months." Thus taxpayer must contend that it remained within the purview of this statute after the words which were the most applicable to it were removed.

13. Treas.Regs. 130, § 40.456–2(b) (1951), as amended, T.D. 6026, 1953–2 Cum.Bull. 235: "Other income, not within a class described in subparagraphs (A)–(D) of section 456(a) (2), to which section 456 is applicable may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such classes similar to those specified in subparagraphs (A)–(D) of section 456(a) (2) as are reasonable in a business of the type which the taxpayer conducts, and as are appropriate in the light of the taxpayer's business experience and accounting practice. Income from the sale of tangible property arising out of research and development which extended over a period of more than 12 months is not included in the list of abnormal types of income to which section 456 is applicable, and such income may not constitute a class of income for purposes of that section. However, section 456 is applicable to such income if the income is otherwise properly includible within a class of income to which such section is applicable, for example, the class described in section 456 (a) (2) (D)."

opment. However, we are unable to find, either in the statute or in the regulations, any class in which to place taxpayer's income other than a classification which is specifically excluded.

■ One matter remains. Taxpayer, prior to the instant case, pursued a claim for relief under § 722 of the WW II Act for overassessments of excess profits taxes for the years 1942 and 1943. In 1951 it was successful. In connection with the settlement it was credited with interest. The government agrees that this interest was abnormal income in 1951. Section 456(a) (2) (A). However, under the WW II Act, the reduction of taxpayer's excess profits income correspondingly increased its normal-tax income, resulting in a deficiency for those years, and an interest charge thereon. The Commissioner held, and was sustained by the Tax Court, that in computing 1951 net abnormal income this interest charge should be subtracted from the abnormal income (i. e., the interest credit) as one of the "costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year * * *." [14]

It is true that the interest charge was a result of, and therefore attributable to, the overassessment to which the interest credit was also attributable. Therefore, in a broad sense, they were "related." It is also true that this charge would, in the general compass of the word, constitute a "deduction" "allowable in determining the normal-tax net income." Int.Rev.Code of 1939, § 23(b),

26 U.S.C.A. § 23(b). There is one little cloud. What is the word "costs" doing there? Having in mind the broad meaning that might be given to "deductions" standing alone (as, indeed, including costs), does the presence of the word "costs" suggest that "deductions relating" was intended to mean something relating in the same manner as costs? In H.R.Rep. No. 3142, 81st Cong., 2d Sess. 63 (1951—1 Cum.Bull. 187, 231), U.S.Code Cong.Service 1950, p. 4093, it is stated that the clause here in question was intended principally as a "clarification of the technical provisions" of § 721 (a) (3) of the WW II Act. Examination of this earlier statute [15] discloses that whatever clarity it may have lacked in other respects, it was entirely clear with regard to the present question. There the phrase corresponding to "deductions relating" ("to such abnormal income") was "expenses, * * * through the expenditure of which" ("such abnormal income was in whole or in part derived"). This was a limited, causative relationship, entirely compatible with the word "costs," and falling far short of the meaning contended for here by the government. It is true that we are to apply § 456(a) (3) and not § 721(a) (3). On the other hand, by reading § 456(a) (3) in the manner contended by the government we find an awkwardness in, and apparent absence of purpose for, the presence of the word "costs," while we find none if this statute is construed to read like its predecessor. In view of the legislative history, we will adopt that construction. [16]

14. "(3) Net abnormal income. The term 'net abnormal income' means the amount of the abnormal income less, under regulations prescribed by the Secretary, (A) 115 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year, as the excess of the amount of such abnormal income over 115 per centum of such average amount bears to the amount

of such abnormal income." Section 456 (a) (3).

15. The corresponding portion of § 721(a) (3) reads as follows: " * * * direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived * * *"

16. For what it may be worth, we note that the example given by the Regulations (Treas.Regs. 130, § 40.456–1(e) (1951)) with respect to this clause hypothesizes "deductible expenses," not just "deductions."

It may be that from an "equitable" standpoint it would be appropriate for taxpayer's interest out to be offset against its interest in. But as the government was quick to assert when the shoe was on the other foot, we are applying tax statutes, not principles of equity. See Babcock & Wilcox Co. v. Pedrick, 2 Cir., 1954, 212 F.2d 645, certiorari denied 1955, 348 U.S. 936, 75 S.Ct. 355, 99 L.Ed. 733. This ruling of the Tax Court must be set aside.

Judgment will enter vacating the decision of the Tax Court, and remanding the case for further proceedings in accordance with this opinion.