JARECKI, FORMER COLLECTOR OF INTERNAL
REVENUE, ET AL. *v.* G. D. SEARLE & CO.

No. 151. Argued March 21, 1961.—Decided June 12, 1961.*

*Wayne G. Barnett* argued the cause for petitioners in
No. 151 and for respondent in No. 169.   With him on the
briefs were former *Solicitor General Rankin, Solicitor
General Cox, Assistant Attorneys General Rice* and *Ober-
dorfer, Acting Assistant Attorneys General Sellers* and
*Heffron, Harry Marselli* and *Norman H. Wolfe.*

*Isaac M. Barnett* argued the cause for petitioner in
No. 169.   With him on the brief was *David Saperstein.*

*Walter J. Cummings, Jr.* argued the cause for respond-
ent in No. 151.   With him on the brief was *Edwin C.
Austin.*

*Together with No. 169, *Polaroid Corporation* v. *Commissioner
of Internal Revenue,* certiorari to the United States Court of Appeals
for the First Circuit, argued March 21–22, 1961.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases present problems in the interpretation of § 456 (a) of the Internal Revenue Code of 1939, a section of the Excess Profits Tax Act of 1950, 64 Stat. 1137. The Act, which is intended to tax at high rates unusually high profits earned during the Korean War, imposes a tax on profits in excess of an amount deemed to represent the taxpayer's normal profits.[1] Recognizing, however, that some profits otherwise subject to tax under this scheme might stem from causes other than the inflated wartime economy, Congress enacted § 456. This section grants relief in certain cases of "abnormal income" as defined in § 456 (a)[2] by allocating some of this income

---

[1] See H. R. Rep. No. 3142, 81st Cong., 2d Sess. 2; S. Rep. No. 2679, 81st Cong., 2d Sess. 2.

[2] Section 456 (a) provides in part:

"(a) DEFINITIONS.—For the purposes of this section—

"(1) ABNORMAL INCOME.—The term 'abnormal income' means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

"(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

"(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

"(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; or

"(C) Income from the sale of patents, formulae, or processes, or any combination of the foregoing, developed over a period of more than 12 months; or

"(D) Income includible in gross income for the taxable year rather

to years other than those in which it was received for purposes of computing the tax.

The dispute in these cases is whether income from the sales of certain new products falls within the statutory definition of "abnormal income." Taxpayers claim that the income from the sales of their products is income resulting from "discovery." They claim it is therefore "abnormal income" within the class defined by § 456 (a)(2)(B) as

"Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months."

Taxpayer in No. 151 is a corporation engaged in the manufacture and marketing of drugs. As a result of research extending for more than 12 months, it produced two new drugs, "Banthine," used in the treatment of peptic ulcers, and "Dramamine," for relief from motion sickness. Taxpayer received patents on both drugs, and it asserts that both were new products and not merely improvements on pre-existing compounds. Taxpayer received income from the sale of "Banthine" and "Dramamine" in the years 1950 through 1952. It paid its tax without claiming relief under § 456, and then claimed a refund. On denial of its claim, taxpayer filed a complaint in the District Court for the Northern District of Illinois. The District Court dismissed the complaint, but the Court of Appeals for the Seventh Circuit reversed. It held that "discovery" might include the preparation of new products and that the case must be remanded for a trial

than for a different taxable year by reason of a change in the taxpayer's method of accounting.

"All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary."

on the issue of whether taxpayer's drugs "were actually discoveries." 274 F. 2d 129, 131.

Taxpayer in No. 169 is the inventor and producer of the "Polaroid Land Process," a camera and film which produce a photograph in 60 seconds, and the "Polaroid 3–D Synthetic Polarizer," a device incorporated in the "viewers" through which audiences watched the three dimensional motion pictures in vogue some years ago. These inventions, each the product of more than 12 months' research, are novel, according to taxpayer, and each has been patented. The Polaroid Land equipment was the subject of 238 patents by the end of 1958, and taxpayer characterizes this invention as "revolutionary." Its production was a new departure in the business of taxpayer, which had hitherto been engaged primarily in manufacturing and selling such optical products as polarizing sunglasses, visors and camera filters. In its returns for 1951 through 1953 taxpayer utilized the provisions of § 456 in computing its tax on income from the sales of its photographic equipment and 3–D polarizers. The Commissioner determined that § 456 was not applicable, and the Tax Court upheld his determination of a deficiency. The Court of Appeals for the First Circuit affirmed, holding that taxpayer's inventions were not "discoveries" and its income from their sale not "abnormal income." 278 F. 2d 148.

We granted certiorari in each case to resolve the conflict between the decisions of the First and Seventh Circuits. 364 U. S. 812, 813.

## I.

For present purposes we accept, as did the First Circuit, taxpayers' assertions of the novelty of their products. But we also agree with that court that taxpayers' inventions are not "discoveries" as that word is used in § 456 (a)(2)(B) and that income from sales of the new

products may not receive the special treatment provided by § 456.

We look first to the face of the statute. "Discovery" is a word usable in many contexts and with various shades of meaning. Here, however, it does not stand alone, but gathers meaning from the words around it. These words strongly suggest that a precise and narrow application was intended in § 456. The three words in conjunction, "exploration," "discovery" and "prospecting," all describe income-producing activity in the oil and gas and mining industries, but it is difficult to conceive of any other industry to which they all apply. Certainly the development and manufacture of drugs and cameras are not such industries. The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress. See, *e. g., Neal* v. *Clark,* 95 U. S. 704, 708–709. The application of the maxim here leads to the conclusion that "discovery" in § 456 means only the discovery of mineral resources.

When we examine further the construction of § 456 (a)(2) and compare subparagraphs (B) and (C), it becomes unmistakably clear that "discovery" was not meant to include the development of patentable products. If "discovery" were so wide in scope, there would be no need for the provision in subparagraph (C) for "Income from the sale of patents, formulae, or processes." All of this income, under taxpayers' reading of "discovery," would also be income "resulting from . . . discovery" within subparagraph (B). To borrow the homely metaphor of Judge Aldrich in the First Circuit, "If there is a big hole in the fence for the big cat, need there be a small hole for the small one?" The statute admits a reasonable construction which gives effect to all of its provisions. In these circumstances we will not adopt a strained read-

ing which renders one part a mere redundancy. See, *e. g.,* *United States* v. *Menasche,* 348 U. S. 528, 538–539.

Taxpayers assert that it is the "ordinary meaning" of "discovery" which must govern. We find ample evidence both on the face of the statute and, as we shall show, in its legislative history that a technical usage was intended. But even if we were without such evidence we should find it difficult to believe that Congress intended to apply the layman's meaning of "discovery" to describe the products of research. To do so would lead to the necessity of drawing a line between things found and things made, for in ordinary present-day usage things revealed are discoveries, but new fabrications are inventions.[3] It would appear senseless for Congress to adopt this usage, to provide relief for income from discoveries and yet make no provision for income from inventions. Perhaps in the patent law "discovery" has the uncommonly wide meaning taxpayers suggest, but the fields of patents and taxation are each lores unto themselves, and the usage in the patent law (which is by no means entirely in taxpayers' favor) [4] is unpersuasive here. All the evidence is

---

[3] In lay terms, Polaroid's photographic equipment and Searle's drugs are probably better called inventions than discoveries. Webster's New International Dictionary, Unabridged (2d ed.) p. 745, makes this distinction: "One DISCOVERS what existed before, but had remained unknown; one INVENTS by forming combinations which are either entirely new, or which attain their end by means unknown before; as, Columbus *discovered* America; Newton *discovered* the law of gravitation; Edison *invented* the phonograph . . . ."

[4] The United States Constitution, Art. I, § 8, cl. 8 gives Congress the power to secure to "Inventors the exclusive Right to their . . . Discoveries." While the terms "discover" and "discovery" are used throughout the patent statutes, they seem generally to appear with "invent" and "invention" as if the terms have separate meanings. See, *e. g.,* 35 U. S. C. § 101: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefor . . . ." And see *Dolbear* v. *American Bell Telephone Co. (Telephone Cases),* 126 U. S. 1, 532–533.

to the effect that Congress did not intend to introduce the difficult distinction between inventions and discoveries into the excess profits tax law.

The relevant legislative history fortifies the conclusions to which the words of the statute lead us. The word "discovery" has been used for many years in the tax laws, and has always been used with the limited meaning of the finding of mineral deposits. In the Revenue Act of 1918, enacting one of the earliest excess profits tax laws, a limit was placed on the excess profits tax on income from "a bona fide sale of mines, oil or gas wells, or any interest therein, where the principal value of the property has been demonstrated by prospecting or exploration and discovery work done by the taxpayer." Revenue Act of 1918, § 337, 40 Stat. 1096.[5] An identical limitation was imposed on the income tax levied under that Act,[6] and the same usage of "discovery" obtained in the allowance of depletion deductions.[7] The limitation on the income tax on the proceeds of the sale of mineral deposits was re-enacted without significant change in the Revenue Acts of 1921, 1924, 1926, 1928, 1932, 1936 and 1938.[8] It remains in the income tax provisions of the Internal Revenue Code of 1939 as § 105 and has been carried forward as § 632 of the 1954 Code. In each re-enactment "dis-

[5] This section was re-enacted by the Revenue Act of 1921, § 337, 42 Stat. 277.

[6] Revenue Act of 1918, § 211 (b), 40 Stat. 1064.

[7] Revenue Act of 1918, §§ 214 (a) (10), 234 (a) (9), 40 Stat. 1067, 1078, providing "That in the case of mines, oil and gas wells, discovered by the taxpayer . . . where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of discovery . . . ."

[8] Revenue Act of 1921, § 211 (b), 42 Stat. 237; Revenue Act of 1924, § 211 (b), 43 Stat. 267; Revenue Act of 1926, § 211 (b), 44 Stat. 23; Revenue Act of 1928, § 102 (a), 45 Stat. 812; Revenue Act of 1932, § 102 (a), 47 Stat. 192; Revenue Act of 1936, § 105, 49 Stat. 1678; Revenue Act of 1938, § 105, 52 Stat. 484.

covery" is linked with "exploration" and "prospecting," and in each the word is restrictively applied to extractive industries. A correspondingly narrow use of "discovery" has continued since 1918 in the depletion allowance sections [9] and appears in § 114 (b)(2) of the 1939 Code. In the more than 30 years preceding the enactment of the section here at issue, during which time "discovery" was used and re-used in successive taxing statutes, the word developed into a term of art of precise and limited meaning.

The Excess Profits Tax Act of 1940, 54 Stat. 975, made specific mention of more types of "abnormal income" qualifying for relief than did the earlier excess profits tax statutes, but there is no indication that it worked any transformation in the meaning of "discovery." Section 721, 54 Stat. 986, as amended, 55 Stat. 21, classified six types of "abnormal income." Among them was the following, at § 721 (a)(2)(C):

> "Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months."

This was the first time specific provision was made for income from invention, relief in cases of such income having previously been obtainable, if at all, only under the "general relief" provisions of the earlier Acts.[10] It is

---

[9] Revenue Act of 1921, §§ 214 (a)(10), 234 (a)(9), 42 Stat. 241, 256; Revenue Act of 1924, § 204 (c), 43 Stat. 260; Revenue Act of 1926, § 204 (c)(1), 44 Stat. 16; Revenue Act of 1928, § 114 (b)(2), 45 Stat. 821; Revenue Act of 1932, § 114 (b)(2), 47 Stat. 202; Revenue Act of 1934, § 114 (b)(2), 48 Stat. 710; Revenue Act of 1936, § 114 (b)(2), 49 Stat. 1686; Revenue Act of 1938, § 114 (b)(2), 52 Stat. 495.

[10] Section 327 (d) of the Revenue Act of 1918, 40 Stat. 1093, gave the Commissioner power to grant relief in any case in which "the tax . . . would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an excep-

instructive that the formula "exploration, discovery, or prospecting" was not considered broad enough to cover invention and that the words "research" and "development" were added to cover that source of income. Plainly, "discovery" retained in the World War II excess profits Act the limited meaning which it had had in the previous Acts and which it continued to have in the income tax provisions of the then-current code.[11]

The relief provisions of the Excess Profits Tax Act of 1950, which we here construe, were modeled in part on § 721 of the World War II Act, but were different in significant respects. In the classifications of income in the new § 456, Congress gave separate treatment to income from discovery of minerals and income from invention. It provided relief in subparagraph (B) for "Income *resulting from* exploration, discovery, or prospecting," but provided in subparagraph (C) only for "Income *from the sale of* patents, formulae, or processes." (Emphasis added.) Subparagraph (C) does not encompass all income from inventions. It does not cover income from the sale of products made under a new patent, the sort of income at issue here. Taxpayers assert that the income from their inventions is, realistically speaking, as "abnormal" in their businesses as the discovery of a new mine would be in the business of a prospector. Their income is within the spirit of § 456, they say, and should be held to be within the letter of subparagraph (B). It is clear, however, that Congress, while it may have recognized the abnormal nature of this sort of income, chose

_____

tional hardship . . . ." Section 721 of the World War II law classified specific types of abnormal income for purposes of computing the tax, and, while it provided relief for all abnormal income of whatever class, was not considered a "general relief" section.

[11] I. R. C. of 1939, §§ 105, 114 (b) (2). It was expressly provided by § 728 of the World War II excess profits tax statute, 54 Stat. 989, that the words used in that statute should have the same meaning as when used in the income tax chapter of the Code.

deliberately to deny relief for it and to limit relief in cases of research and development to that provided in subparagraph (C).

The relief provisions of the World War II Act had been intended to provide "flexible rules," [12] and their application had often been an uncertain affair. In administering § 721 the Commissioner often faced the difficult task of separating income which was the product of "research, or development" from that resulting merely from improved management or sales efforts. The difficulty of distinction led the Tax Court to hold that the distinction must be made "by exercising common sense and judgment," and that "It is entirely possible that the allocation made by one person would never match that made by another." *Ramsey Accessories Mfg. Corp. v. Commissioner,* 10 T. C. 482, 489. Congress in 1950 recognized the delay and uncertainty caused by the element of administrative discretion in this and other [13] sections and set about drafting an excess profits tax law on the principle that "subjective judgments . . . should be avoided in the new law." H. R. Rep. No. 3142, 81st Cong., 2d Sess. 20. This principle was expressly followed in the drafting of § 456. The Senate Committee reported on § 456 as follows:

> "The equivalent provision in the World War II law (sec. 721) also permitted adjustments with reference to certain other types of income, particularly that resulting from the sale of tangible property arising out of research and development which extended over a period of more than 12 months. This pro-

---

[12] H. R. Rep. No. 146, 77th Cong., 1st Sess. 2.

[13] The "general relief" section of the World War II Act, § 722, 54 Stat. 986, as amended, 55 Stat. 23, 701, 56 Stat. 914, 57 Stat. 56, 601, 58 Stat. 55, provided for adjustments in the computation of base period income if the taxpayer established, among other things, "what would be a fair and just amount representing normal earnings" during the base period.

vision in the old law was a potential loophole of major dimensions. Because there appeared to be no means of restricting such an adjustment to truly meritorious cases other than by the introduction of a large degree of administrative discretion of the type required by the general relief clause of the World War II law (sec. 722), and because the need for a reallocation of such income seemed to be materially less than for' the other classes of income described above, the bill omits this item from the list of abnormal types of income for which a reallocation can be made." S. Rep. No. 2679, 81st Cong., 2d Sess. 14.

The House Committee Report was virtually identical. H. R. Rep. No. 3142, 81st Cong., 2d Sess. 13.

Taxpayers recognize, as they must, that Congress intended its change in language to limit the kinds of income eligible for relief. They say, however, that not all income from research and development was excluded. That which comes from inventions not merely patentable but also sufficiently revolutionary to be called "genuine discoveries" is still within the protection of § 456. We find it impossible to believe that an amendment designed to eliminate uncertainty and administrative discretion would introduce into the law—without a congressional word of warning or explanation—a distinction as vague, as dependent upon nuances of scientific opinion, and as unprecedented as that urged by taxpayers.

## II.

Taxpayers have another argument, which the First Circuit rejected and which the Seventh Circuit did not reach. Paragraph (1) of § 456 (a) defines "abnormal income" as "income of any class described in paragraph (2)" which meets certain requirements. Paragraph (2) lists four classes of income and provides in its concluding sentence:

"The classification of income of any class not described in subparagraphs (A) to (D), inclusive,

shall be subject to regulations prescribed by the Secretary."

Taxpayers argue that even if the income here at issue was not provided for under any of the subparagraphs of paragraph (2), it is nevertheless included within this final sentence and is hence eligible for relief.

We need not decide the precise effect of the sentence relied on. In light of the clear purpose of Congress in enacting § 456 to cut down not only the amount of administrative discretion which had prevailed under the predecessor section but also the scope of available relief, the power of the Secretary to extend relief far beyond the four corners of the statute may be doubted.[14] It is sufficient to note that, unlike its predecessor (which made relief available for all "abnormal income," whether or not specified in a particular class),[15] § 456 applies only to those classes specified in § 456 (a)(2). Section 456 does not apply in terms to all abnormal income and contains no indication that the Secretary should create administrative classifications embracing all such income. And even if the sentence relied on gives the Secretary power to expand the classes of abnormal income somewhat beyond the four enumerated in the statute, he has clearly not done so here. The regulations [16] specifically provide that

---

[14] In fact, the Committee reports state that "Adjustments . . . [under § 456] are limited to income arising out of" the four classes specified in subparagraphs (A) through (D). H. R. Rep. No. 3142, 81st Cong., 2d Sess. 13; S. Rep. No. 2679, 81st Cong., 2d Sess. 14.

[15] Excess Profits Tax Act of 1940, § 721, 54 Stat. 986, as amended, 55 Stat. 21. Section 721 (a)(1) defines "abnormal income" as "income of any class includible in the gross income of the taxpayer . . . ."

[16] Treas. Reg. 130, § 40.456–2 (b) (1951), as amended, T. D. 6026, 1953–2 Cum. Bull. 235: "Other income, not within a class described in subparagraphs (A)–(D) of section 456 (a)(2), to which section 456 is applicable may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such classes similar to those specified in subparagraphs (A)–(D)

"Income from the sale of tangible property arising out of research and development which extended over a period of more than 12 months is not included in the list of abnormal types of income to which section 456 is applicable, and such income may not constitute a class of income for purposes of that section." This specific exclusion is clearly in furtherance of the purpose of Congress in deleting "research" and "development" income from its classification of abnormal income. The Commissioner, effecting the will of Congress, has barred relief for the type of income here at issue.

The last sentence of the regulation, on which taxpayers also rely, does not aid them. It provides merely that "research" and "development" income is eligible for relief if it is properly includible in a class of income to which § 456 otherwise applies. As we have held, however, taxpayers' income does not fall within any such class.

Therefore, the judgment of the Court of Appeals for the Seventh Circuit must be reversed and the judgment of the Court of Appeals for the First Circuit affirmed.

*It is so ordered.*

---

of section 456 (a) (2) as are reasonable in a business of the type which the taxpayer conducts, and as are appropriate in the light of the taxpayer's business experience and accounting practice. Income from the sale of tangible property arising out of research and development which extended over a period of more than 12 months is not included in the list of abnormal types of income to which section 456 is applicable, and such income may not constitute a class of income for purposes of that section. However, section 456 is applicable to such income if the income is otherwise properly includible within a class of income to which such section is applicable for example, the class described in section 456 (a) (2) (D)."