MARYLAND JOCKEY CLUB OF BALTIMORE CITY, a Maryland corporation,

v.

UNITED STATES of America.

No. 11641 Civil.

United States District Court
D. Maryland.
Nov. 23, 1960.

Jacob Kartman, Stanley H. Wilen, and Burke, Gerber & Wilen, Baltimore, Md., for plaintiff.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md., Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, and Benjamin H. Pester, Attys., Dept. of Justice, Washington, D. C., for defendant.

THOMSEN, Chief Judge.

This is an action to recover income taxes alleged to have been erroneously assessed and collected for the fiscal period which began December 1, 1954 and ended August 31, 1955, and for the fiscal year ended August 31, 1956. The issue presented is whether certain sums paid to taxpayer out of the "Racing Fund" pursuant to Art. 78B, sec. 12, Annotated Code of Maryland, 1957 ed.,[1] as reimbursement for capital expenditures, alterations and improvements previously authorized by the Maryland Racing Com-

---

[1] The pertinent portions of sec. 12 as enacted by ch. 706 of the Acts of 1951 were codified as follows (Anno.Code of Maryland, 1951 ed., Art. 78B, sec. 12):

"12. (a) For the calendar year 1947 and for each year thereafter, each licensee licensed under the provisions of § 7 of this article shall deduct one-half of one percentum from the total amount of money wagered on all races during each and every meeting and shall pay to the Maryland Racing Commission, for the use of the State of Maryland, such sums so deducted as a tax; the payment of said tax shall be accompanied by a statement of the licensee or its duly authorized agent, under oath, showing the amount of money wagered each day during the preceding meeting. All deductions and tax payments made hereunder shall be held in and comprise a fund to be known as the 'Racing Fund,' and shall be deposited by the Commission in one or more banks or trust companies in the State. The members of the Commission shall have no personal liability for loss to such Fund by reason of the failure or insolvency or other fault of any depository if they shall use ordinary care in the selection of the depository. The Commission shall require any depository to secure by collateral any deposit therein comprising a part or all of the Fund.

"(b) The Commission shall not be required to remit any part of the Racing Fund on hand at any time to the Comptroller or to the Treasurer of the State, unless and until said Fund shall revert to the general treasury of the State in the manner hereinafter provided.

"(c) The amount of the Racing Fund on hand at any time, representing the deductions made by any particular licensee from the mutuel pool, previously deducted by such licensee and paid to the State as a tax, may, with the prior written and express permission of the Commission, upon such terms and conditions as it may prescribe, be granted by the Commission to that particular licensee as a contribution to its capital for any substantial alterations, additions, changes, improvments or major repairs to or upon the property owned or leased by such licensee and by it used for the conduct of racing. In determining whether to make such grant or grants as contributions to capital of any portion of the Racing Fund, the Commission shall give due consideration to whether its expenditure in each instance will promote the safety, convenience and comfort of the racing public and horse owners and generally whether it will tend toward the improvement of racing in this State. In the fiscal year 1952, any amount granted by the Commission, as provided in this

mission, constituted "gross income" within the meaning of sec. 61, I.R.C.1954, 26 U.S.C.A. § 61, or "contributions to the capital", excluded from gross income by sec. 118, 26 U.S.C.A. § 118.

In United States v. Maryland Jockey Club, 4 Cir., 210 F.2d 367, certiorari denied 347 U.S. 1014, 74 S.Ct. 869, 98 L.Ed. 1137, which involved the taxable year 1948 and earlier versions of the Maryland statute and the Internal Revenue Code, the Fourth Circuit held that the payments out of the Racing Fund were taxable income in the year in which they were received by taxpayer. See also Southern Maryland Agricultural Ass'n of Prince George's County v. United States, D.Md., 126 F.Supp. 125,

affirmed 4 Cir., 227 F.2d 200. The principal question in this case is whether the present statutes require a different result.

## Facts

The facts are stipulated and need not be stated herein more fully than is necessary for an understanding of the issue. No question of jurisdiction or procedure is presented.

During all times material to this suit, taxpayer owned the Pimlico Race Course in Baltimore, Maryland, and operated the track subject to Art. 78B of the Maryland Code and the Rules of Racing issued by the Maryland Racing Commission. Taxpayer's principal income was derived from admission fees, concessions,

section, is hereby appropriated by the State, out of such tax collected in the fiscal year 1952 and out of the Racing Fund on hand on July 1, 1951, to the licensee involved for the purposes allowed by the Commission as herein authorized. For the fiscal year 1953 and for every fiscal year thereafter, the Governor shall include in his budget or any supplemental budget the estimated receipts to be derived from the imposition of such tax during such fiscal year and any unexpended balance on hand in the Racing Fund at the beginning of such fiscal year, less any reversion of the same as hereinafter provided, to be granted by the Commission to such licensees as provided in this section. If amounts equal to the deductions herein provided made by any licensee for any calendar year shall neither have been spent or binding commitments have been entered into for their expenditures as grants to licensees within three (3) years from the last day of the year of collection, the unspent portion of such years' deduction and tax payment shall revert to the General Treasury of the State and shall be paid over by the Commission to the Comptroller; provided, however, that, due to the present emergency, amounts equal to the deductions of any licensee on hand in the Racing Fund at the effective date of this Act may be granted as contribution to capital by the Commission to the licensee who contributed such amount for the purposes herein provided at any time prior to March 31, 1953. If and when any licensee abandons its present location for racing and operates at the track of another licensee, its pro rata share of the

Racing Fund may, by mutual agreement between the licensees involved, with the approval of the Racing Commission, be granted by the Commission and, if so, is hereby appropriated for capital improvements, as hereinabove authorized, at the track of the licensee wherein the meeting was run."

By ch. 422 of the Acts of 1953 the following subsection was added to sec. 12:

"(e) The Maryland Racing Commission is specifically empowered and authorized, in making commitments or grants, pursuant to and for the purposes set forth in subsection (c) of this section, to make, or to bind itself to make, such grant or grants as contributions to capital, in such manner and upon such terms and conditions as it may prescribe, and any such grant or grants or commitments heretofore made by the Racing Commission are hereby ratified, sanctioned and approved, and whenever hereafter a licensee is to expend, with the prior written and express permission of the Commission, for any such substantial alterations, additions, changes, improvements or major repairs, hereafter commenced, an amount greater than then credited to it in the Racing Fund, the Racing Commission is further specifically empowered and authorized to repay, or to enter into an agreement to repay, the licensee for any or all of such expenditures from future payments into the Racing Fund by the licensee. This subsection shall not be construed as implying that in the absence hereof, the provisions of this section could properly have been or shall be otherwise construed."

parking charges and its share of the pari-mutuel betting allowed by law.

Taxpayer kept its books and filed its income tax returns on a cash basis. In its return for the fiscal period ended August 31, 1955, taxpayer reported gross income of $2,336,871.14, net income of $23,169.32, and paid an income tax thereon of $7,923.05. The corresponding figures for the fiscal year ended August 31, 1956, were $5,408,614.00, $490,648.93, and $215,447.54.

Since 1947 taxpayer has paid to the Racing Commission pursuant to Art. 78B, sec. 12, as that section has read from time to time, one-half of one percent of the gross amounts wagered and taken in from pari-mutuel betting on all races at Pimlico. The amounts so deducted and paid into the "Racing Fund" were not reported by taxpayer as income and/or deductions from income in its income tax returns.

During the fiscal period ended August 31, 1955, taxpayer received from the Racing Commission out of the "Racing Fund" the sum of $212,607.09 as reimbursement for certain capital expenditures, alterations and improvements previously authorized by the Commission pursuant to Art. 78B, sec. 12.[2] This reimbursement of $212,607.09 was credited against an asset account and was not included in taxpayer's 1955 income tax return, either as income or as part of its gross receipts. The sum of $92,174.65, received by taxpayer for similar purposes during the fiscal year ended August 31, 1956, was treated in the same way.

Upon examination of the returns, the Commissioner of Internal Revenue adjusted taxpayer's income to include the payments received from the Racing Fund as additional income and assessed additional taxes of $95,695.43 and $27,764.21, respectively, for the tax periods in question. The amounts assessed, plus interest thereon of $15,688.81 and $2,885.96, were paid by taxpayer.

The expenditures of $304,781.74 ($212,607.09 plus $92,174.65), representing the costs of the capital improvements referred to above, for which taxpayer received reimbursement out of the Racing Fund, were not included by taxpayer in the basis for depreciation of its depreciable assets. See sec. 362(c), I.R.C. 1954, 26 U.S.C.A. § 362(c). Nevertheless the Commissioner, in asserting the deficiencies, allowed taxpayer a credit for depreciation on those improvements. Taxpayer concedes that if it prevails in its contention that the payments received from the Racing Fund were not taxable income, it is not entitled to an allowance of depreciation based on such expenditures.

The amounts collected by taxpayer and paid to the Racing Commission pursuant to Art. 78B, sec. 12, the amounts received by taxpayer from the Racing Fund, and the unspent balances of taxpayer's share of the Fund from November 30, 1952, through the tax years in question were as follows:

| Fiscal Year Ended | Tax Payments | Reimbursements from "Racing Fund" | Unspent Portion |
|---|---|---|---|
| 11/30/53 | $163,774.31 | $328,586.01 | $ 60,513.27 |
| 11/30/54 | 166,739.13 | 14,645.31 | 212,607.09 |
| 8/31/55 | 84,269.25 | 212,607.09 | 84,269.25 |
| 8/31/56 | 162,940.78 | 92,174.65 | 155,035.38 |

---

2. These alterations and improvements included rebuilding the bottom of the inner half of the track, adding topsoil, and rebuilding the grandstand.

### Discussion

In the former Maryland Jockey Club case the Fourth Circuit said, 210 F.2d at page 370:

"* * * the sum involved was received by taxpayer through the operations of its pari-mutuel betting at its race track. It was allowed to collect the sum, but was required to deposit it in a State Racing Fund to be held for a three year period during which the State could not acquire absolute title, use or enjoyment of the fund. If the fund was needed for permanent capital improvements it could, with the permission of the Racing Commission, be drawn upon by taxpayer. If not drawn within three years it became the property of the State. Until that time the State never acquired absolute title to the Racing Fund involved. It was a fund created and set aside for the use of the taxpayer if the need arose, and could not be used by the Racing Commission for any other purpose. The Racing Commission did not collect the sums as a tax. It was not a taxing agency but a regulatory body. Thus, where the fund never vested absolutely in the State as is clearly the fact here, it was never the State's fund for subsidies but represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it later realized enjoyment to the extent that the fund was utilized. No track could withdraw from the Fund more than it paid in; no track could use the money paid into the Fund by another track."

Then, after discussing the Cuba Railroad case, Edwards v. Cuba R. Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, and other authorities, the Fourth Circuit opinion continued:

"* * * it is argued that this money was never 'earned' by the taxpayer, since the moment a bet was placed, ½ of 1% thereof immediately vested in the Racing Commission. Be that as it may, this money was received and collected by taxpayer as a result of the operation of its track. Federal income taxes are based on reality not form, on fact not fancy, on substance not seeming. See, Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886; Irwin v. Gavit, 268 U.S. 161, 166, 45 S.Ct. 475, 69 L.Ed. 897; Roberts v. Commissioner of Internal Revenue, 9 Cir., 176 F.2d 221, 225, 10 A.L.R.2d 186.

"To summarize, we think the moneys here involved were clearly taxable income. They were (a) not derived from the general funds of the State; (b) they were *not* characterized by the State as a subsidy or grant; (c) they were derived from receipts from the taxpayer's business; (d) they were explicitly earmarked and escrowed in a special account; (e) they were not even available to the State of Maryland except after the lapse of three years and even then only if they had not been expended by the taxpayer; (f) they were available to the taxpayer at any time within the three year period, with the permission of the Commission, 'for any substantial alterations, additions, changes, improvements or repairs' to its property used for the conduct of racing; and (g) finally, they were actually received by the taxpayer in reimbursement for such expenditures. We are led to believe that little or no money placed in the Racing Fund has ever reverted to the State of Maryland."

Taxpayer argues that the present statutes, Federal and State, require a different result from that reached by the Fourth Circuit in the former Maryland Jockey Club case.

Sec. 118 of Title 26 U.S.C.A., providing that "gross income" of a corporation does not include any "contribution to its capital", appears for the first time in the 1954 Code. It was intended to bring the statute into conformity with the

court decisions,[3] which were discussed by the Fourth Circuit in the former Maryland Jockey Club case, 210 F.2d at page 369, et seq. It does not materially change the applicable Federal Law. Merten's Law of Federal Income Taxation, secs. 38.20 and 38.23.

Although the former Maryland Jockey Club case and the Southern Maryland Agricultural Ass'n case dealt with the Maryland statute, Art. 78B, sec. 12, as it stood before 1951, the taxpayer in the latter case contended that the 1951 and 1953 amendments showed that the Racing Fund was owned by the State both before and after the Act of 1951, and that the payments therefrom were subsidies or contributions to capital. Neither this court nor the Fourth Circuit intimated in those cases any opinion with respect to the possible effect of the 1951 and 1953 amendments on income taxes for later years.

Taxpayer seeks to distinguish the former cases by pointing to the differences between the former sec. 12 of Art. 78B and the present version, which denominates the payments into the Racing Fund a "tax" and the payments to a licensee out of its share in the Fund as "grants" and as a "contribution to its capital for any substantial alterations, additions, changes, improvements or major repairs to or upon the property owned or leased by such licensee and by it used for the conduct of racing", and

provides for the necessary items in the State's budget to give effect to the arrangement.

An examination of the two statutes, however, makes it clear that the differences between them are matters of form and language rather than of substance and reality. There is no real difference between the respective rights of the taxpayer and the State in the Racing Fund under the two versions of sec. 12; the Racing Commission exercised the same control over that Fund after the Act of 1951 that it exercised over the Fund before that Act.[4]

When we check the payments to taxpayer involved in this case against the seven tests listed in the summary at the end of the Fourth Circuit's opinion in the former Maryland Jockey Club case, quoted above, we find no substantial change in six of the tests:

(a) The "grants" in question were not derived from the *general* funds of the State. All such grants are made from the balance on hand in the Racing Fund to the credit of the particular track. It is agreed that no part of that Fund, either before or after the 1951 amendment to sec. 12, has ever become subject to general use by the State; the payments into the Fund have always been returned to the tracks within the three year period, usually much sooner.[5] See also discussion under (d) below.

3. Sen.Rep. No. 1622, 83rd Cong., 2nd Sess., p. 190, reads as follows:

"The House and your committee's bill provide that in the case of a corporation, gross income is not to include any contribution to the capital of the taxpayer. This in effect places in the code the court decisions on this subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services.

"In a section dealing with the basis of property contributed to a corporation both the House and your committee's bill provide that a corporation takes a zero basis for contributions to capital by nonstockholders."

4. The Act of 1951 could not have been inspired by the Report of the Special Committee to Investigate and Study Racing, dated October 1, 1952, cited by taxpayer. The policy of the State both before and after the Act of 1951 was the same, although the particular purposes for which the several tracks wished to use the money differed from time to time.

5. E. g. see the schedule in the last paragraph of "Facts" supra.

(c) They were derived from receipts from taxpayer's business, i. e. through the operations of pari-mutuel betting at its race track.[6] Taxpayer's contention in the former case "that this money was never 'earned' by the taxpayer, since the moment a bet was placed, ½ of 1% thereof immediately vested in the Racing Commission", was answered by the Fourth Circuit, saying: "Be that as it may, this money was received and collected by taxpayer as a result of the operation of its track. Federal income taxes are based on reality not form, * * *." 210 F.2d at page 371.

(d) They were explicitly earmarked and though denominated a tax were in effect escrowed in a special account. Each of the Maryland budgets duly enacted by the General Assembly of Maryland for the State's fiscal years ending June 30, 1955, June 30, 1956, and June 30, 1957, in appropriating and authorizing the disbursement of Racing Fund receipts, provided as follows:

"Race Track Upkeep
"To racing licensees licensed under the provisions of Section 7 of Article 78B of the Annotated Code of Maryland (estimated receipts) for the uses set forth and limited by Section 12 of Article 78B of the Annotated Code in the amount therein provided.
"Special Fund Appropriation. . . . . . $460,000.00.
"All the revenues collected under the provisions of Section 12 of Article 78B are by law dedicated for the purposes set forth as to said revenues. Any surplus remaining at the end of the fiscal year does not revert to the General Treasury but

is carried forward for use during the subsequent fiscal year subject to the limitations and restrictions of Section 12 of Article 78B. It is the intention that the monies collected shall be available for the purposes set forth in Section 12 of Article 78B." [7]

(e) They were not available to the State of Maryland for its general purposes except after the lapse of three years and even then only if they had not been granted to taxpayer by the Racing Commission to be expended for capital improvements or major repairs; and, as we have seen, no such funds have ever become available to the State.

(f) They were available to the taxpayer at any time within the three year period, with the permission of the Commission, "for any substantial alterations, additions, changes, improvements or major repairs" to its property used for the conduct of racing; the addition of the adjective "major" is not very significant; and in fact

(g) They were actually received by taxpayer in reimbursement for such expenditures, as all such funds always have been.

Only (b) is different. The payments to taxpayer are now stated to be grants made as contributions to its capital for the purposes designated.

Taxpayer argues in its brief: "It may well be that it was the specific legislative intent in so framing the Act of 1951 to avoid the dilution of its grants by the impact of income taxes. But whatever may have been the legislative intent in that respect, the result must necessarily be the same."

6. A part of the pari-mutuel pool is paid to the winners, a part is retained by the track, a part is paid to the State for its general purposes, and one-half of one percent, both before and after the Act of 1951, is paid to the Racing Commission to be held in the "Racing Fund", subject to the provisions of sec. 12.

7. Ch. 43 of the Laws of Maryland, 1954; ch. 339 of the Laws of Maryland, 1955; ch. 42 of the Laws of Maryland, 1956. The above appropriation of $460,000.00 is for the fiscal year ended June 30, 1955; the subsequent two years were in the amounts of $480,000.00 each.

■ It is true that a court will ordinarily construe a statute in accordance with its terms to give effect to the intention of the legislature. If a legislature chooses to make a capital contribution to a corporation out of the general funds of the state or out of a special fund which really belongs to the state, a federal court must recognize the contribution for what it is, and treat it as nontaxable under the present income tax law. But it is the substance of the transaction and not the label attached to it which should control. A legislature does not make a transaction something it is not, merely by giving it a name, nor make a fund the property of the state when in fact a licensee has such an interest in the fund, albeit a conditional interest, that the fund has not yet become available to the state and will not become available to the state except upon the occurrence of an unlikely contingency.[8]

Taxpayer argues that a decision favorable to it in this case would not cause any loss of revenue to the government, because if the reimbursements received are taxed as income taxpayer will be entitled to annual deductions for depreciation over the useful life of the assets, and over the course of the years the amount of depreciation allowable to taxpayer will result in a reduction in its taxes almost equal to the tax it is required to pay as a result of the Commissioner's assessment. Taxpayer's argument, however, overlooks the fact that if the reimbursements are not taxed as income taxpayer and not the government would have the use of the additional money equal to the amount of the taxes over the period necessary to depreciate the assets.[9]

Both before and after the Act of 1951 the payments were made to taxpayer to reimburse it for certain capital expenditures approved by the Racing Commission. The issue in this case is not whether the payments were used or to be used for capital purposes or for current expenses, as it was in some of the cases cited by taxpayer. The issue in this case is whether such payments were *contributions* to capital by the State of Maryland. That issue is controlled by the factors listed in the summary quoted above from the opinion of the Fourth Circuit, and by the principles announced in that opinion.

■ Applying those principles to the facts of this case and to the Maryland statute, I conclude that the payments to taxpayer out of the Racing Fund were income derived from its business within the meaning of sec. 61(a), and were not contributions to its capital within the meaning of sec. 118 of the I.R.C., 1954.

The clerk is instructed to enter judgment in favor of the defendant, with costs.

8. On September 1, 1959, an attorney in the Legal Unit of the Comptroller of the Treasury of the State of Maryland wrote taxpayer's counsel: "Recently the Department in conjunction with the Attorney General's office and after a conference with you reviewed the legislative history which led to the enactment of Chapter 706 of the Laws of Maryland (1951), and from our review the conclusion is reached that there did exist at the time of the introduction of legislation identified as House Bill No. 616 a legislative intent established to relieve the owners of the race tracks entitled to the benefits prescribed under Section 12 of Article 78B from taxation under the Maryland Income Tax Law of the sums withdrawn from the duly created and established Racing Fund." The decision of the Maryland Department is entitled to respectful consideration, but it does not control the decision of this case. Although the language of the income tax statutes is similar, the respective interests of the State of Maryland and of the United States in taxing such payments are different.

9. There is also the possibility that taxpayer may have some unprofitable years, even become insolvent, and that the tax or other laws may be changed.