The MARYLAND JOCKEY CLUB OF BALTIMORE CITY, a Maryland corporation

v.

UNITED STATES of America.

Civ. No. 12979.

United States District Court
D. Maryland.

Feb. 18, 1964.

Jacob Kartman, Baltimore, Md., for plaintiff.

Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, First Asst. U. S. Atty., Baltimore, Md., Mosche Schuldinger and John M. Hammerman, Attys. Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Rufus E. Stetson, Jr., and Bernard J. Schoenberg, Attys. Dept. of Justice, on the brief), for defendant.

THOMSEN, Chief Judge.

This is an action for the recovery of deficiencies in excess profits tax, assessed against and paid by taxpayer with respect to its fiscal years ending November 30, 1950, and November 30, 1953.[1]

The question presented is whether certain payments which taxpayer received from the "Racing Fund" during the fiscal years in question were "abnormal income", as that term is defined in sec. 456, I.R.C.1939, which was added to the Code by sec. 101 of the Excess Profits Tax Act of 1950.[2] That section grants relief in certain cases of "abnormal in-

---

1. All references to years in this opinion will be to taxpayer's fiscal years.

2. Sec. 456, I.R.C.1939 (as added by sec. 101 of the Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137), entitled Abnormalities in Income in Taxable Period, provides in pertinent part:

"(a) Definitions.—For the purposes of this section—

"(1) Abnormal Income.—The term 'abnormal income' means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable

years, the taxable years during which the taxpayer was in existence.

"(2) Separate Classes of Income.— Each of the following subparagraphs shall be held to describe a separate class of income:

"(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

"(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; or

"(C) Income from the sale of patents, formulae, or processes, or any combination of the foregoing, developed over a period of more than 12 months; or

"(D) Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's method of accounting.

"All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classifica-

come", as defined in sec. 456(a), by allocating some of that income to years other than those in which it was received, for purposes of computing the excess profits tax.

Although at one time taxpayer contended that the amounts it received from the Racing Fund were not taxable income, it has now abandoned that contention in view of the decisions in United States v. Maryland Jockey Club, 4 Cir., 210 F.2d 367 (1954), cert. den. 347 U.S. 1014, 74 S.Ct. 869, 98 L.Ed. 1137, and in Maryland Jockey Club of Baltimore City v. United States, 4 Cir., 292 F.2d 469 (1961), affirming D.Md., 189 F.Supp. 70 (1960). See also Southern Maryland Agricultural Ass'n v. United States, D. Md., 126 F.Supp. 125 (1954), aff'd 4 Cir., 227 F.2d 200 (1955).

### Facts

The facts are stipulated and need not be stated herein more fully than is necessary for an understanding of the issue. No question of jurisdiction or procedure is presented.

During all times material to this suit, taxpayer owned the Pimlico Race Course in Baltimore, Maryland, and operated the track subject to Art. 78B of the Maryland Code and the Rules of Racing issued by the Maryland Racing Commission. Taxpayer's principal income was derived from admission fees, concessions, parking charges and its share of the pari-mutuel betting allowed by law. It kept its books and filed its federal income tax returns on a cash basis.

Pursuant to a series of resolutions adopted by the Racing Commission,[3] and a series of statutes enacting and amending what is now Art. 78B, sec. 12 of the Maryland Code,[4] taxpayer has paid to the Racing Commission since 1944, one-half of one percent of the gross amounts wagered and taken in from pari-mutuel betting on all races at Pimlico. The

---

tion of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary.

"(3) *Net abnormal income.*—The term 'net abnormal income' means the amount of the abnormal income less, under regulations prescribed by the Secretary, (A) 115 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year, as the excess of the amount of such abnormal income over 115 per centum of such average amount bears to the amount of such abnormal income.

"(b) *Amount Attributable to Other Years.*—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Secretary. * * *

"(c) *Computation of Tax for Current Taxable Year.*—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

"(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is at-

tributable to any other taxable year, and

"(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

"* * * *

"(e) *Application of Section.*—This section shall be applied only for the purpose of computing the tax under this subchapter as provided in subsections (c) and (d), and shall have no effect upon the computation of base period net income. For the purposes of subsections (c) and (d)—

"* * * *

"(2) Under regulations prescribed by the Secretary, the tax under this subchapter for previous taxable years shall be computed as if the portions of net abnormal income for each previous taxable year for which the tax was computed under this section were included in the gross income for the other previous taxable years to which such portions were attributable. * * * *"

3. Set out in 118 F.Supp. at 351.

4. Some of which are set out in 118 F.Supp. at 350 and some in 189 F.Supp. at 71, fn. 1.

amounts paid by taxpayer into the so-called "Racing Fund" were to be returned to taxpayer from time to time after it had spent or made binding commitments to spend the money for capital improvements to the track. Other licensees made similar payments into the Racing Fund, which were similarly segregated for their benefit. The relevant statutory language was as follows:

"The amount of the Racing Fund on hand at any time, representing the deductions made by any particular licensee from the mutuel pool, previously collected by such licensee, as agent of the Commission, may, with the prior written and express permission of the Commission, upon such terms and conditions as it may prescribe, be expended by that particular licensee for any substantial alterations, additions, changes, improvements, or repairs to or upon the property owned or leased by such licensee, and by it used for the conduct of racing. In determining whether to permit the use of any of the Racing Fund, the Commission shall give due consideration to whether its expenditure in each instance will promote the safety, convenience and comfort of the racing public and of horse owners and, generally, whether it will tend towards the improvement of racing in the State. If the deductions, herein provided for, made by any licensee for any calendar year, as agent of the Commission, shall neither have been spent nor binding commitments have been entered into for their expenditure, with the approval of the Commission, within three (3) years from the last day of the year of collection, the unspent portion of such year's deduction shall revert to the State as part of its general funds, and shall be paid over promptly by the Commission to the Comptroller. Provided, however, that due to the present war emergency, such deductions of any licensee for the calendar years 1944, 1945 and 1946 may be expended or binding commitments entered into for its expenditure at any time prior to December 31, 1950." [5]

No part of the moneys paid into the Racing Fund by taxpayer or any other licensee has ever reverted to the State. Each licensee has always been allowed to withdraw over a period of years all of the payments which it made into the Fund.

Between 1944 and 1950 taxpayer paid the following amounts into the Fund:

| Year | Amount |
|------|--------|
| 1944 | $102,864.33 |
| 1945 | 115,156.53 |
| 1946 | 155,134.94 |
| 1947 | 137,220.76 |
| 1948 | 114,207.72 |
| 1949 | 97,134.25 |
| 1950 | 99,065.35 |
|      | $820,783.87 |

Taxpayer received a distribution from the Fund in 1948 in the amount of $75,-608.66; so the balance remaining in taxpayer's share of the Fund in 1950 was $745,175.21. That entire amount was paid to taxpayer in 1950. Taxpayer actually spent or entered into binding commitments to spend only $27,686.33 for requisite improvements in 1950. It was unable to spend or commit the balance of $717,488.88 because of restrictions on construction imposed by the federal government as a result of the national emergency arising out of the Korean War. Neither taxpayer nor the responsible State officials wanted that balance or any part thereof to revert to the State under the statutory provision quoted above, so an agreement was reached whereby the entire balance of $717,488.88 was paid to taxpayer in 1950, to be utilized in the

5. Sec. 11A of ch. 502, Laws of Maryland, 1947, codified as Art. 78B, sec. 12 of Flack's Anno.Code of Md., 1947 Cum. Supp. For amendments to sec. 12 in 1951 and 1953, see 189 F.Supp. at 71, fn. 1.

future for authorized improvements to its plant. Taxpayer furnished the Racing Commission a surety bond guaranteeing that if the sum of $717,488.88 was not spent or committed for the purposes specified within one year after the repeal of the existing prohibitions, or such additional period (not to exceed two years from such repeal) as the Racing Commission might allow, taxpayer would pay to the Racing Commission, as liquidated damages, that part of said $717,488.88 which had not been so spent or committed.

From 1951 to 1953, taxpayer made additional payments to the Racing Fund as follows:

| Year | Amount |
|------|--------|
| 1951 | $ 63,312.55 |
| 1952 | 162,012.42 |
| 1953 | 106,071.97 |
|      | $331,396.94 |

Taxpayer received a further distribution from the Fund in 1953 in the amount of $328,586.01, which was spent or committed for expenditure during that year on authorized improvements to its plant.

### Discussion

Sec. 456, I.R.C.1939, the 1950 provision dealing with abnormalities in income, was based on the experience gained from administering sec. 721, its counterpart in the World War II Excess Profits Tax Act.[6] It is clear from an examination of the two provisions and from the legislative history of sec. 456, discussed in Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859, that Congress intended the scope and application of the 1950 provision to be nar-

rower than that of its predecessor, although both statutes afford generally the same relief with respect to income which qualifies as "abnormal income" under the requirements of the applicable statute.[7] The substantial differences between the two sections are in their respective definitions of what constitutes abnormal income.

Sec. 721(a) (1), the earlier law, defined abnormal income as "income of *any class* * * * if it is abnormal for the taxpayer to derive income of such class * * *" (emphasis supplied). Although sec. 721(a) (2) spelled out six separate classes of abnormal income, the term abnormal income was not limited to those classes.

In contrast to the broad provision of the earlier act, sec. 456(a) (1) defines abnormal income as "income of any class described in paragraph (2) * * *." See note 2, above. Paragraph (2) describes four and only four distinct classes of income.

#### A.

Taxpayer's principal argument is that the payments fall within the first class described in sec. 456(a) (2), namely: "(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing". It concedes that the payments do not fall within any of the other three classes.

Taxpayer argues that the payments received from the Racing Fund constitute income arising out of a "claim". "Claim" is a broad and comprehensive term, which has so many possible meanings that the context in which it is used must always be considered. Whenever a taxpayer bills a customer for goods sold, he may be said to be asserting a claim, but

6. Excess Profits Tax Act of 1940, ch. 757, 54 Stat. 975, as amended by Excess Profits Tax Amendments of 1941, ch. 10, 55 Stat. 17, sec. 721.

7. The portion of the amounts which is attributable to prior or subsequent years is taxed in the current year, for excess profits tax purposes, as if it were received in the years to which it were attributable. Both provisions limit the amount which

can qualify as abnormal income where the taxpayer has received like amounts in previous years. Under Section 456 the limit is the excess of the abnormal income received in the taxable year over 115 percent of the "average amount of the gross income of the same class for the four previous taxable years." Sec. 721 has the same limitation except that the percentage was 125 rather than 115.

it is clear that the word "claim", as used in sec. 456(a) (2) (A), was not intended to have such a broad meaning. The maxim *noscitur a sociis* throws light on the proper construction of the statute. In Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859, the Court considered the meaning of the word "discovery", as used in sec. 456(a) (2) (B), which describes the second class of income which may qualify as abnormal income, namely: "(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months". The Court said:

"'Discovery' is a word usable in many contexts and with various shades of meaning. Here, however, it does not stand alone, but gathers meaning from the words around it. These words strongly suggest that a precise and narrow application was intended in § 456. The three words in conjunction, 'exploration,' 'discovery' and 'prospecting,' all describe income-producing activity in the oil and gas and mining industries, but it is difficult to conceive of any other industry to which they all apply. Certainly the development and manufacture of drugs and cameras are not such industries. The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." 367 U.S. at 307, 81 S.Ct. at 1582, 6 L.Ed.2d 859.

Similarly, the word "claim" in sec. 456(a) (2) (A) gathers meaning from the words which follow it—"award", "judgment" and "decree". These words "strongly suggest that a precise and narrow application was intended".

Few cases have reached the courts involving sec. 456, no doubt because its provisions are so specific. Under sec. 721 (the World War II provision), as we have seen, abnormal income was not limited to the six classes specified, but was more broadly defined. Nevertheless, special treatment was given to income falling within the several classes, one of which was "income arising out of a claim, award, judgment or decree, or interest on any of the foregoing", the same words with which we are concerned here. That provision was construed by the Tax Court in a number of cases, of which Yuba Gardens, Inc. v. Commissioner, 17 T.C. 334, is the leading case. Yuba Gardens, Inc., involved a taxpayer which sold parcels of land under long-term contracts. Many of the purchasers had fallen into arrears in their payments, but in 1942 and 1943 those arrearages were paid. The taxpayer, which was also reporting on the cash basis, had to take the arrearages into income when paid, but sought to have the arrearages treated as abnormal income for excess profits tax purposes. The Court said:

"Clearly, the income under consideration does not arise out of an 'award, judgment, or decree.' The question is whether it is income derived from a claim. Although it does not seem that Congress intended to restrict the meaning of the term 'claim' to technical items such as litigated claims, it does appear that something more than an existing right is necessary to come within the intendment of the statute. Since the term is used in connection with 'award, judgment, or decree', it appears that at the least the statute requires that there be a bona fide dispute or an asserted demand." 17 T.C. at 343.

In Triboro Coach Corp. v. Commissioner, 29 T.C. 1274, decided under the 1950 Act, Triboro, an accrual basis taxpayer, operated suburban bus lines in Queens County, New York. In the fiscal years 1949 to 1952 passengers might transfer between City-owned transit lines and suburban bus lines by paying a combination ride fare. In 1949 and 1950 Triboro was allowed one-half cent per rider for the accounting for combination rides. Triboro asked for 1.5 cents for such accounting. In 1949 City represen-

tatives offered one cent, which Triboro refused. In 1951 Triboro accepted the City's offer. In the division of the combination fares for the year 1952 Triboro was allowed one cent per ride more than other bus operators to reimburse it for the additional one-half cent per ride for accounting in 1949 and 1950. The Tax Court held that the additional one cent per ride was income in 1952. The Tax Court further held that this amount was "abnormal income" arising out of a "claim" and attributable to other years under sec. 456. Citing Yuba Gardens, Inc., the Court said:

"The respondent argues that Triboro had no claim, that it simply sought a rate increase and prior to the resolution of the Board of Estimates in June, 1951, had no color of right to the amount subsequently credited to it on this account, which was earned under the new contract.

"It is clear from the testimony that Triboro was pressing a request for an increased allowance * * *

There was at least a dispute or an asserted demand sufficient to constitute a 'claim'." 29 T.C. at 1280.

■ In the present case there was no dispute, and no asserted demand sufficient to constitute a "claim". This Court and the Fourth Circuit have heretofore held that taxpayer's share of the Racing Fund was "never the State's fund for subsidies but represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it later realized enjoyment to the extent that the fund was utilized." United States v. Maryland Jockey Club, 4 Cir., 210 F.2d at 370.[8] See also Maryland Jockey Club of Baltimore City v. United States, D.Md., 189 F.Supp. 70, at 74, 76, aff'd 4 Cir., 292 F.2d 469;[9] Southern Maryland Agriculture Ass'n v. United States, D.Md., 126 F.Supp. 125, aff'd 4 Cir., 227 F.2d 200. It is manifest from the way in which the Fund was administered that all sums paid into the Fund by a particular licensee were intended to revert to that licensee. In all the years that the Fund

---

8. The entire passage from which this quotation was taken reads as follows:
"* * * the sum involved was received by taxpayer through the operations of its pari-mutuel betting at its race track. It was allowed to collect the sum, but was required to deposit it in a State Racing Fund to be held for a three year period during which the State could not acquire absolute title, use or enjoyment of the fund. If the fund was needed for permanent capital improvements it could, with the permission of the Racing Commission, be drawn upon by taxpayer. If not drawn within three years it became the property of the State. Until that time the State never acquired absolute title to the Racing Fund involved. It was a fund created and set aside for use of the taxpayer if the need arose, and could not be used by the Racing Commission for any other purpose. The Racing Commission did not collect the sums as a tax. It was not a taxing agency but a regulatory body. Thus, where the fund never vested absolutely in the State as is clearly the fact here, it was never the State's fund for subsidies but represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it

later realized enjoyment to the extent that the fund was utilized. No track could withdraw from the Fund more than it paid in; no track could use the money paid into the Fund by another track." 210 F.2d at 370.

9. The following discussion of the moneys in the Racing Fund, appearing in 189 F.Supp. at 76, is in point:
"(e) They were not available to the State of Maryland for its general purposes except after the lapse of three years and even then only if they had not been granted to taxpayer by the Racing Commission to be expended for capital improvements or major repairs; and, as we have seen, no such funds have ever become available to the State.
"(f) They were available to the taxpayer at any time within the three year period, with the permission of the Commission, 'for any substantial alterations, additions, changes, improvements or major repairs' to its property used for the conduct of racing; the addition of the adjective 'major' is not very significant; and in fact
"(g) They were actually received by taxpayer in reimbursement for such expenditures, as all such funds always have been."

has been in existence the State has never received a penny from it. In reality, the Fund constituted a reserve for capital improvements to the track, required by state law. It was a mechanism by which the State compelled taxpayer to set aside part of its earnings for capital improvements to the track, rather than to use the funds for other purposes, such as salaries or dividends. The only thing taxpayer had to do to obtain all or part of its share of the Fund was to expend this money or commit the expenditure thereof for authorized improvements to its own plant of the type specified in Art. 78B, sec. 12 of the Maryland Code, quoted and discussed in the previous decisions of this Court and of the Fourth Circuit.

What has been said applies to both the 1950 and the 1953 payments. The conclusion is not changed by the special circumstances surrounding the 1950 payment, which arose out of the restrictions imposed by the federal government during the Korean emergency. Art. 78B, sec. 12, in effect in 1950, provided that money not spent or committed by a licensee within three years after its payment into the Fund would revert to the State, except that moneys paid in for the calendar years 1944, 1945 and 1946 had to be spent or committed before December 31, 1950. See portion of the statute quoted under "Facts", above. The responsible State officials were as anxious as taxpayer that the money taxpayer had paid into the Fund should be returned to taxpayer and used to improve its plant.[10] Therefore, by agreement, the parties substituted a new condition—essentially, that taxpayer should spend or commit the $717,488.88 for specified improvements as soon as legally possible—in place of the existing condition, to use it in three years or before December 31, 1950. There was no dispute. Taxpayer neither had nor asserted any claim or demand to receive the $717,488.88 in 1950. The money was paid to it pursuant to a voluntary agreement with the State officials, later ratified by statute[11] and approved by a State court in a suit brought by a taxpayer, referred to in note 10, above.

The payments were not income arising out of a "claim".

### B.

Taxpayer's alternative argument is that even if it is not entitled to classify the income in question as income arising out of a "claim", it is nonetheless entitled to relief under the last sentence of sec. 456(a) (2), which reads: "The classification of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary." The relevant regulation reads as follows: *"Classification of Income. * * * (b) Other income,* not within a class described in paragraphs (A)–(D) of section 456(a) (2), to which section 456 is applicable may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such classes similar to those specified in subparagraphs (A)–(D) of section 456 (a) (2) as are reasonable in a business of the type which the taxpayer conducts, and as are appropriate in the light of the taxpayer's business experience and ac-

---

10. See opinion of Judge Manley, sitting as the Circuit Court of Baltimore City, in *Pressman v. Maryland Jockey Club,* a case in which the propriety of the 1950 payment was challenged. Judge Manley said:

"The case is unusual in that former Attorney General Hammond—now Judge Hammond of the Court of Appeals of Maryland—in his official position as Attorney General contends that the money should not be paid to the State of Maryland, and his successor evidently adopted the same view as there has been no change on the record in the defenses asserted by the Attorney General's office as counsel for the Racing Commission and the State Comptroller. Comptroller Tawes in his answer *in effect* says that the State is not only not entitled to the money, but does not want it. Mr. H. Courtenay Jenifer, a member of and former Chairman of the Racing Commission, testified emphatically that this money belongs to the Jockey Club and should not be turned back to the State or to the Racing Fund."

11. Acts of 1953, ch. 422, quoted in 189 F. Supp. at 72, fn.

counting practice." T.R. 130 (1939 Code), sec. 40.456.2. The Secretary has never approved any additional class into which the income in question might fall. It is quite clear from the legislative history and from the opinion of the Supreme Court in the Jarecki case, discussed in the next paragraph, that sec. 456 was not intended to recreate the chaos which resulted from the broad provisions of sec. 721 in the 1940 Act, and that classes in addition to the four described in sec. 456(a) (2) could only be created with the specific approval of the Secretary, which has never been given.

The same argument taxpayer now makes was made by the taxpayers in the two cases which were considered together by the Supreme Court sub. nom. Jarecki v. G. D. Searle & Co., 367 U.S. 314, 81 S.Ct. 1585, 6 L.Ed.2d 859. The point had not been reached by the Seventh Circuit in the Jarecki case, but had been decided adversely to the taxpayer in the other case, Polaroid Corp. v. C. I. R., 1 Cir., 278 F.2d 148 (1960). Speaking for the First Circuit, Judge Aldrich had said, p. 155:

> "We agree with taxpayer that this sentence may be taken as giving the Secretary the authority to accept classifications outside of the express provisions of subparagraphs (A)–(D). But the language is permissive, and we have found nothing in the historical background indicating that the Secretary's role in agreeing to additional classifications was to be one of obligation rather than of discretion. We therefore reject any contention that the Secretary, or Commissioner, was required to grant relief on the basis of a classification suggested by a taxpayer merely because the taxpayer has income which meets the other tests of abnormality. Nor do the regulations themselves assist the taxpayer. First, any classification by a taxpay-

er is 'subject to approval by the Commissioner,' and such approval was not given here. Secondly * * *"

The second reason discussed by Judge Aldrich does not apply to the present case. The Supreme Court affirmed the First Circuit, saying:

> "We need not decide the precise effect of the sentence relied on. In light of the clear purpose of Congress in enacting § 456 to cut down not only the amount of administrative discretion which had prevailed under the predecessor section but also the scope of available relief, the power of the Secretary to extend relief far beyond the four corners of the statute may be doubted. It is sufficient to note that, unlike its predecessor (which made relief available for all 'abnormal income,' whether or not specified in a particular class), § 456 applies only to those classes specified in § 456(a) (2). Section 456 does not apply in terms to all abnormal income and contains no indication that the Secretary should create administrative classifications embracing all such income. And even if the sentence relied on gives the Secretary power to expand the classes of abnormal income somewhat beyond the four enumerated in the statute, he has clearly not done so here. * * *" 367 U.S. at 314, 81 S.Ct. at 1585–1586, 6 L.Ed.2d 859.

■ Although there was specific language in the regulations dealing with research and development, which does not apply here, the portions of the opinions of the First Circuit and the Supreme Court which are quoted above apply in the present case to support if not require the conclusion that taxpayer is not entitled to relief under the last sentence of sec. 456(a) (2).

Judgment will be entered for the defendant, without costs.