758 F.2d 722
 244 U.S.App.D.C. 402
 RCA GLOBAL COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
FTC Communications, Inc. and ITT World Communications, Inc.,
Intervenors.
 No. 83-2291.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 23, 1985.
Decided April 5, 1985.
 
 Jeffrey Frackman, New York City, for petitioner.
 Nancy E. Stanley, Atty., F.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Bruce E. Fein, General Counsel, F.C.C., Daniel M. Armstrong, Associate General Counsel, F.C.C., John E. Ingle and Jane E. Mago, Attys., F.C.C., and Robert B. Nicholson and Margaret B. Halpern, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Roger P. Newell, New York City, for intervenor FTC Communications, Inc. Gerald Goldman, Washington, D.C., entered an appearance for FTC Communications, Inc.
 John A. Ligon, New York City, was on the brief for intervenor ITT World Communications, Inc.
 Before WRIGHT, MIKVA and SCALIA, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 RCA Global Communications (RCA), a major international provider of record telecommunications services, petitions for review of an order of the Federal Communications Commission refusing to disallow a customer tariff submitted by one of RCA's small competitors, FTC Communications, Inc. (FTCC). The challenged tariff enables FTCC to differentiate between the rate charged customers who use FTCC's network for both the domestic and the international components of an overseas transmission and the rate charged when another company provides the service to or from FTCC's international switch. RCA and intervenor ITT World Communications, Inc., another major provider of international record communications, maintain that the price differential violates Section 202(a) of the Communications Act, which prohibits "unjust or unreasonable" price discrimination in the provision of "like communication service[s]." 47 U.S.C. Sec. 202(a) (1982). The FCC and intervenor FTCC contend that the tariff is a permissible application of that section of the Record Carrier Competition Act of 1981 (RCAA or the Act) that exempts carriers lacking a "significant share of the market" from several of the Act's strictures. 47 U.S.C. Sec. 222(c)(1)(B) (the Small Carrier Exemption). Because we agree with the FCC that RCA's view of the statute would render the Small Carrier Exemption a nullity, we affirm.
 
 I. BACKGROUND
 A.
 
 2
 Record communications, as distinct from voice communications such as telephones, include "those services traditionally offered by telegraph companies, such as telegraph, telegram, telegram exchange, and similar services involving an interconnected network of teletypewriters." 47 U.S.C. Sec. 222(a)(3). Although new technologies are rapidly adding to the array of services provided by record carriers, their principal offering continues to be Telex, a teleprinter exchange circuit over which subscribers can transmit typewritten or data communications by dialing other stations on the network. TWX, a major offering of the Western Union Telegraph Company, provides a similar service but is oriented more toward transmission of low speed data than simple messages. See In the Matter of Western Union Telegraph Co., 49 FCC2d 532, 534 (1974).
 
 
 3
 Although the federal government's concern with record communications dates to the mid-19th century, it did not undertake comprehensive regulation until the enactment of the Communications Act of 1934. See 47 U.S.C. Sec. 151 et seq. See generally Western Union Telegraph Co. v. FCC, 665 F.2d 1126, 1132 (D.C.Cir.1981); ITT World Communications, Inc. v. FCC, 635 F.2d 32 (2d Cir.1980); Note, The United States Record Communications Dichotomy--Time for a Change, 11 VAND. J. OF TRANSNAT'L L. 781 (1978). In 1943 Congress amended the Communications Act to respond to impending structural changes in the domestic record carriage industry. During the 1930's the fortunes of record carriers in the United States had seriously declined. In an effort to forestall further economic distress, Western Union, already the dominant entity in domestic and international telecommunications, and the Postal Telegraph Company, its principal competitor, had proposed a merger. Because this combination would result in a virtual monopoly, substantial antitrust obstacles lay in its path. Nonetheless, recognizing the significant national interest in preventing the collapse of the American record carrier industry, Congress enacted legislation designed to remove all barriers to the merger. 47 U.S.C. Sec. 222 (repealed by the RCCA and also codified at Section 222 of Title 47). Legislative approval, however, was not without a price. In return for enabling a new company (still called Western Union) to obtain a de facto monopoly, Congress required that the merged carrier divest itself of all overseas operations and facilities.
 
 
 4
 Thus, under the regime that developed under the original Section 222, the international and domestic record communications industries were almost entirely distinct, with the domestic segment under the virtually exclusive control of Western Union.[1] The international segment of the market, although not dominated by any one carrier, was quickly occupied by what amounted to an oligopoly. See 127 Cong.Rec. H8899 (daily ed. December 8, 1981) (statement of Representative Wirth) (describing the international record communications industry as a "cartel"). In 1980 a congressional committee found that RCA Global Communications, ITT World Communications, and Western Union International, Inc. (wholly separate from the domestic Western Union) controlled 91.7 percent of the international market. H.R.Rep. No. 97-356, 97th Cong., 1st Sess. 39 (1981) (hereinafter House Report ). FTCC, with fewer than 250 customers,[2] had less than a 1.2 percent market share. Id.
 
 
 5
 In 1981 Congress restructured federal regulation of the record communication industry. Believing that the line between domestic and international record communications markets was no longer in the public interest, Congress repealed the "outmoded" dichotomy established in the 1943 legislation. House Report at 4. In its stead Congress enacted the Record Carrier Competition Act, which sought to remove all artificial barriers to vigorous competition in both the domestic and the international segments of the industry. In particular, the Act eliminated the prior prohibition against Western Union's participation in the international market.
 
 
 6
 Unlike the earlier act, the RCCA had a distinctly pro-competitive bias. Its overarching objective was to enable consumers of record carrier services to "get the products and services they want, at the lowest possible price." 127 Cong.Rec. H8905 (daily ed. December 8, 1981) (statement of Representative Wirth). Thus, the Act gave the FCC a broad mandate to "promote the development of fully competitive domestic and international markets in the provision of record communications service" and to "forbear from exercising its authority" under the entire Communications Act "as the development of competition among record carriers reduces the degree of regulation necessary to protect the public." 47 U.S.C. Sec. 222(b)(1).
 
 
 7
 Consistent with this desire to encourage development of a fully competitive market, Congress sought to assure that elimination of the prior de facto and legal barriers to simultaneous occupation of international and domestic markets not result in continued dominance by the already established industry giants. In particular, Congress feared that Western Union and the three major International Record Carriers (IRCs) would leverage their position into an even greater market share. Western Union's advantage derived from its already extensive domestic subscriber base. Unless a competitor for the domestic market could sell access to Western Union's 140,000 customers,[3] it would be "nearly impossible to sell 'the first' subscriber." House Report at 5. Moreover, by manipulating the price charged to other carriers for access to its domestic network, Western Union could create a powerful incentive to use its lines for both the domestic and the international legs of a transmission. Freiden, International Telecommunications and the Federal Communications Commission, 21 COLUM.J.TRANSNAT'L L. 423, 468 (1983) (hereinafter Freiden).
 
 
 8
 The IRCs, because of their oligopolistic position in the international market, had a similar advantage. By manipulating the cost of interconnection to their networks, they could encourage their established customer bases to use their services for the entire transmission. Id.; International Record Carrier Competition Act of 1981: Hearings on S. 271 Before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 110 (1981) (statement of Robert Flanagan, Chairman of the Board, Western Union); International Record Carriers' Scope of Operations, supra, 76 FCC2d at 124. Compounding this advantage was the often exclusive relationship already in place between the IRCs and the governments of the foreign countries they serve. Absent an operating agreement with a foreign government's Postal Telegraph and Telegram Authority (PTT), efforts to provide record communications to that country are all but impossible. Not only does the physical construction of international transmission capacity require an ongoing relationship with the foreign government, but, equally important, the circuit cannot be completed without access to the PTT's domestic network. Freiden at 474. Congress recognized that the historical unwillingness of PTTs to negotiate with prospective entrants into the international market not only enabled foreign authorities to affect the composition of the United States record carrier industry directly, but also gave the established IRCs a vehicle for preserving their dominant position in the international arena and converting that dominance into a significant share of the domestic market. House Report at 6, 10; Freiden at 468.
 
 
 9
 The RCCA contains three related mechanisms to guard against the possibility that the established record carriers, both Western Union and the IRCs, would exploit their market positions once the artificial wall separating domestic and international markets was removed.[4] First, the Act requires that each record carrier permit unrestricted "interconnection" to the lines of every other record carrier. 47 U.S.C. Sec. 222(c)(1)(A)(i). Second, it provides that record carriers that offer both international and domestic services "shall be treated as a separate domestic record carrier and a separate international record carrier for purposes of administering interconnection requirements." Id. Sec. 222(c)(1)(B)(i). Third, the Act requires that such "separate domestic [or international] record carrier" must make interconnection with its network available to any other "separate international [or domestic] record carrier" on equal terms and at the same rates. Id. Sec. 222(c)(1)(B)(ii-iii). The latter two requirements do not apply to carriers that do not control a significant share of the market. Id. Sec. 222(c)(1)(B).[5]
 
 
 10
 Perhaps the easiest means of explicating the RCCA's "interconnection" provisions is to trace a hypothetical transmission from Milwaukee, Wisconsin to Cairo, Egypt.[6] For purposes of this example we assume that a single International Record Carrier such as RCA has an exclusive agreement with Egypt and that, accordingly, the overseas portion of the message must travel on its lines. Because, again hypothetically, RCA's international switch to Cairo is in New York (the "gateway" city), the message must somehow travel from Milwaukee (the "hinterland" in pre-RCCA industry parlance) to New York.[7] The domestic portion of the transmission might be via RCA's own domestic network or that of a non-affiliated competitor, say Western Union.[8]
 
 
 11
 The Act requires first that, in the event the customer uses Western Union's Milwaukee-to-New York network to gain access to the international switch, RCA must accept interconnection of the transmission to its line to Cairo. Second, the Act requires that RCA treat its domestic and international operations as wholly distinct and, third, that it charge its competitor (Western Union in the hypothetical) and its own "separate" corporate affiliate the same rate for interconnecting to RCA's New York-to-Cairo line. Thus the cost of the international segment of the transmission will be identical regardless of whether the customer uses RCA's facilities or those of a domestic competitor to get the message from Milwaukee to the international switch in New York.
 
 
 12
 The equal interconnection requirements prohibit a pricing arrangement that would enable an international or domestic industry giant to convert its dominance in one market into a substantial share of the other market while virtually precluding new entrants from gaining a toehold in the industry. In the example set out above, RCA could undercut its competitors for the Milwaukee-to-New York portion of the transmission simply by charging an end-to-end fee for the entire Milwaukee-to-Cairo transmission that is less than the sum of the fee for use of RCA's international line from New York to Cairo and the fee for use of a competitor's line from Milwaukee to New York.
 
 
 13
 To illustrate, suppose that RCA charges $2.00 per minute for interconnection to its New York-to-Cairo line and that Western Union charges $.50 per minute for sending the message to New York from Milwaukee. Suppose further that RCA gives its subscribers a single end-to-end rate of $2.25 for the entire Milwaukee-to-Cairo transmission. The rational consumer who communicates frequently with Cairo would use RCA, not Western Union, to send his message. He must use RCA for the international segment, because, in the hypothetical, only RCA has an operating agreement with Egypt. He will use RCA, not a competitor, for the domestic segment because RCA's through rate ($2.25) is less than the sum of the non-affiliate's domestic rate and the rate charged for interconnection to RCA's international line ($2.50). Even if there were no exclusive operating agreement, the consumer effects significant savings by using only RCA's services.
 
 
 14
 Section 222 guards against this kind of practice by creating a fictitious line between RCA's international and domestic operations and by requiring, for example, that its international branch deal with its domestic branch on the same terms as a non-affiliated domestic competitor. Thus "end-to-end" through rates are prohibited. Instead, the Act requires RCA to "unbundle"[9] all overseas messages not actually originating at the international switch. To continue the example, the Act mandates that RCA treat the Milwaukee-to-Cairo message--even if entirely on the RCA network--as two units, a Milwaukee-to-New York segment and a New York-to-Cairo segment. The Act further mandates that it charge precisely the same fee for interconnection to its international line regardless of whether the Milwaukee-New York transmission is on RCA's own network or on that of a domestic competitor. By prohibiting RCA from charging its through customers less than it, in effect, charges its competitors' domestic subscribers for the international segment of the transmission, the Act inhibits RCA's capacity to leverage its established and often exclusive control of an international network into a substantial share of the domestic market as well.
 
 B.
 
 15
 The Act's requirement that carriers make their lines available to competitors applies to all carriers irrespective of size or market power. The RCCA, however, specifically exempts carriers without "a significant share of the market" from the twin requirements of treating international and domestic operations as "separate" and of furnishing interconnection to all "separate domestic [or international] record carrier[s] * * * at the same rates and upon the same terms and conditions." 47 U.S.C. Sec. 222(c)(1)(B)(i-ii).
 
 
 16
 Armed with a prior FCC determination that it qualified for this Small Carrier Exemption[10]--a determination that is not here challenged--FTCC submitted a customer tariff for FCC approval. Under this tariff FTCC sought to take advantage of its exemption from Section 222's unbundling requirement by offering customers who use FTCC for both domestic and international segments of a transmission an end-to-end rate that was less than the combined rate a customer would pay if it used FTCC's facilities in combination with the facilities of another carrier. For example, FTCC proposed to charge its own customers $1.34 per minute for a call to Great Britain but would charge other carriers $1.0432 to interconnect a call originating on a competitor's network with its international line. Because the rate charged by the other carrier for the domestic segment is generally $0.384, a customer using FTCC's line in conjunction with a non-affiliate would pay $1.4272 for the transmission, nine cents more than he would pay had he used FTCC exclusively. See Common Carrier Bureau Order of July 1, 1982 (reproduced in Joint Appendix (JA) at 73). The tariff's nine-cent differential applied to all of FTCC's routes, thus enabling the company to give its customers a lower rate for international service than any other carrier presently provides. Id.
 
 
 17
 FTCC's major competitors for the international record carrier business, including RCA, petitioned the FCC to reject FTCC's proposed tariff. JA 19-45. Although not contesting FTCC's exemption from Section 222's unbundling requirement, they contended that the proposed tariff's nine-cent differential violated 47 U.S.C. Sec. 202(a), which prohibits "unjust or unreasonable discrimination in charges * * * for * * * like communication service." They were not (and are not) entirely clear about which class of consumers suffers the allegedly illegal price discrimination. The gist of their argument, however, was that the tariff was illegally discriminatory because it resulted in different rates for overseas transmissions depending on whether the message originated with FTCC or with a competitor.
 
 
 18
 Pursuant to its delegated authority, the FCC's Common Carrier Bureau denied the petitions to reject FTCC's tariff. See FTC Communications, Inc., Transmittal No. 130 (Mimeo No. 4924), JA 73-77. It held that the tariff was not unreasonably discriminatory within the meaning of Section 202(a),[11] that the tariff was a straightforward exercise of the Small Carrier Exemption, which exemption would be "rendered a nullity" if the tariff were considered impermissible, id. at 76, and that, in any event, refusal to disallow the tariff was a permissible exercise of the Commission's statutory power to "forbear" regulating if such forbearance furthered competition in the record carrier industry. See 47 U.S.C. Sec. 222(b)(1). RCA then filed a complaint against the tariff pursuant to 47 U.S.C. Sec. 208, making virtually the same arguments it and the other IRCs had advanced in their petition to reject. See JA 116-119. The Common Carrier Bureau dismissed the complaint, this time limiting its analysis to the scope of the Small Carrier Exemption. RCA Global Communications, Inc. v. FTC Communications, Inc., E-82-17 (September 2, 1982), JA 159-160. Finally, RCA applied for full FCC review of both Common Carrier Bureau orders. In a brief, two-page opinion the FCC found that the Bureau had "correctly disposed of the issues presented" and denied the application. FTC Communications, Inc., FCC 83-469, JA 163-164. This petition followed.[12]III. ANALYSIS
 
 A. The Availability of Judicial Review
 
 19
 Prior to joining issue on the merits, the FCC argues that the statutory question posed in this case is not open to review. In essence it argues that a series of administrative rulings, which were made final by this court in Western Union Telegraph Co. v. FCC, 729 F.2d 811 (D.C.Cir.1984), fully resolved the question whether an exempt carrier may give preferential treatment to its end-to-end customers. RCA, although a participant in those proceedings, did not seek review of the precise question it now seeks to litigate. Accordingly, the Commission insists, permitting RCA to mount a challenge in this petition would undermine statutory time limits on judicial review of final FCC orders. See 28 U.S.C. Sec. 2341 et seq. (1982); Natural Resources Defense Council v. NRC, 666 F.2d 595 (D.C.Cir.1981).
 
 
 20
 Understanding the FCC's finality argument requires a brief excursion through the convoluted history of the Commission's efforts to implement the RCCA. In order to generate intercarrier arrangements during the three-year transitional period following enactment, the Act required the FCC to convene an industry-wide meeting to negotiate an interconnection agreement. 47 U.S.C. Sec. 222(c)(3)(A). After the statutorily mandated meeting failed to produce an agreement, the Commission instituted rulemaking proceedings. See Interconnection Arrangements, Notice of Proposed Rulemaking, 89 FCC2d 194 (1982). Shortly thereafter, the FCC issued an order establishing interim interconnection agreements and requiring that carriers file tariffs in conformity with the order. Interconnection Arrangements, 89 FCC2d 928 (1982) (Interim Order ). The Interim Order explicitly determined that FTCC qualified for the Small Carrier Exemption and that, accordingly, the company "need not operate as if its domestic and international segments were separate entities." 89 FCC2d at 956.
 
 
 21
 All of the carriers, including FTCC, filed tariffs in an effort to comply with the Interim Order. Relying on Section 202(a)'s anti-discrimination language, ITT and Western Union International petitioned the FCC to reject FTCC's tariff, which was substantively similar to that at issue in the present controversy.
 
 
 22
 In Interconnection Arrangements, Memorandum Opinion and Order, 91 FCC2d 483 (1982) (Prescription Order), the Commission rejected in their entirety the tariffs filed by all of the carriers. Rather then allowing the carriers the latitude to again misconstrue its order, the Commission prescribed the precise language that the carriers were to include in all future tariffs. The Prescription Order did not expressly respond to the earlier petition to reject FTCC's tariff or to the several other petitions to reject or suspend that had been filed. Instead, the Commission stated in a footnote that the issues raised in the various petitions but not discussed in its opinion "were found to be without merit or mooted by other arguments." Prescription Order, 91 FCC2d at 486 n. 7. The Commission did not distinguish between those arguments it considered meritless and those rendered moot by its wholesale rejection of all tariffs submitted pursuant to the Interim Order. The opinion, however, did make clear that FTCC qualified for the Small Carrier Exemption and that, accordingly, it was exempt from the requirement that it unbundle its rates. 91 FCC2d at 488 n. 9. The opinion's explanation of the exemption's effect, if any, on the rates actually charged customers was limited to a single, cryptic reference, which we quote in the margin.[13]
 
 
 23
 The carriers then petitioned for reconsideration of both the Interim Order and the Prescription Order. The FCC denied those parts of the petition relevant to the instant controversy. Interconnection Arrangements, Memorandum Opinion, Order, and Request for Further Comments, 93 FCC2d 845 (1983) (Reconsideration Order), and the carriers petitioned this court for review of all three orders--the Reconsideration Order, the Prescription Order, and the Interim Order. In Western Union Telegraph Co. v. FCC, supra, this court affirmed in part and reversed in part. The carriers' petition for review did not raise and the decision did not confront the question whether an exempt carrier might favor its customers by charging an unbundled through rate less than that charged when its line is used in conjunction with that of another carrier.
 
 
 24
 Nonetheless, the Commission believes that, somewhere during the course of the labyrinthine history of the implementation of the RCCA, RCA forfeited its right to appeal this precise question in this proceeding. In particular, the FCC maintains that a prescription of tariff matters has the binding force of a rule. See Nader v. FCC, 520 F.2d 182, 200-205 (D.C.Cir.1975). Because, in the FCC's view, RCA failed to pursue its objection to FTCC's rates in its petition for review of the Prescription Order, it may not attack a tariff that merely implements the earlier prescription. To sanction this conduct, we are told, would violate general notions of finality and the statutory bar to judicial review of appeals filed more than 60 days after issuance of the initial order. See 28 U.S.C. Secs. 2341-2349 (1982); Natural Resources Defense Council v. NRC, supra.
 
 
 25
 We are not persuaded. The argument founders on the erroneous assumption that the Commission's prior order had confronted the issue presented in this appeal at all, much less disposed of the question with sufficient clarity to put RCA on notice that failure to pursue its claim would bar subsequent review in this court. The Commission's entirely private view that two utterly opaque footnotes in a lengthy opinion disposed of the statutory question and now preclude this appeal comports with neither elemental fairness nor our precedent. Although statutory time limitations on judicial review of agency action are jurisdictional, see Nat'l Bank of Davis v. Office of Comptroller of Currency, 725 F.2d 1390, 1391 n. 1 (D.C.Cir.1984) (per curiam), self-evidently the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content. None of the cases in this circuit even remotely suggest the contrary. Indeed, even if we were to conclude that Natural Resources Defense Council v. NRC, supra, the case principally relied on by the Commission, is applicable in the circumstances of this case,[14] that decision would provide no support for the FCC's position. In that decision the court recognized that participants in rulemaking may not later complain of the rule's invalidity "on grounds fully known to them at the time of [its ] issuance." 666 F.2d at 602-603 (emphasis added). See also Outward Continental N. Pacific Freight Conf. v. FMC, 385 F.2d 981, 982-983 n. 3 (D.C.Cir.1967) (per curiam ).
 
 
 26
 We simply cannot agree that a fair reading of the Prescription Order, or any other relevant FCC decision, permits the conclusion that RCA did know or should have known that the Commission had confronted, much less resolved, the issue RCA now petitions us to review. The only issues pertaining to this case explicitly resolved in those proceedings were whether FTCC qualifies as a small carrier and whether, accordingly, it is exempt from the requirements of Section 222(c)(1)(B). But RCA contests neither determination. The question posed by this case is the meaning of the exemption, not its existence--whether it follows from a carrier's exempt status that it may validly implement a price differential favoring customers who use both its domestic and its international operations for overseas transmissions.
 
 
 27
 Western Union International and ITT did seek to put that issue in the case by petitioning to reject FTCC's tariff. But in rejecting all the tariffs submitted in response to the Interim Order, the Commission chose not to address the merits of the specific petitions to reject. The ambiguous statement that all matters not discussed were meritless or moot, Prescription Order, 91 FCC2d at 486 n. 7, helps the FCC's position not at all. Without the aid of telepathy, we cannot know which arguments the FCC believed were meritless and which were mooted by the wholesale rejection, on other grounds, of all the tariffs submitted pursuant to the Interim Order. Nor can the FCC seriously rely on note 14 of the Prescription Order[15] for evidence that it clearly validated a tariff substantively identical to the one at issue in this case. That note, which we find incomprehensible on this record, may well have "contemplated" the legality of FTCC's price differential, brief for respondents at 11, but its opacity renders it susceptible of numerous other constructions as well.
 
 
 28
 At most, the FCC can argue that the permissibility of the price differential was subsumed by the earlier determination that FTCC was exempt from the requirements of Section 222(c)(1)(B). But that is precisely the premise RCA now denies. It would be patently unfair to hold that an agency's entirely unspoken (or impenetrably obscure) belief that Proposition B follows from Holding A may be the basis for precluding judicial review of Proposition B simply because the party aggrieved participated in the administrative proceeding that resulted in Holding A. Yet that is precisely what the FCC asks this court to do. We reject that effort and now turn to the merits of RCA's petition.
 
 B. The Statutory Question
 
 29
 We need not confront the correctness of the Commission's alternative holdings that the challenged tariff is not discriminatory within the meaning of Section 202(a) or is a justifiable application of the FCC's Section 222(b)(1) power to "forbear" from regulation in order to promote development of competition in the record carrier industry. For we have concluded that, whatever the validity of the agency's reasoning on those issues, it correctly found that the challenged tariff falls squarely within the terms of Section 222's Small Carrier Exemption. To hold otherwise would effectively excise the exemption from the statute, a result the most fundamental principles of statutory construction will not permit. See Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307-308, 81 S.Ct. 1579, 1582-1583, 6 L.Ed.2d 859 (1961); Nat'l Treasury Employees Union v. Devine, 733 F.2d 114, 118 (D.C.Cir.1984); FTC v. Manager, Retail Credit Co., Miami Branch Office, 515 F.2d 988, 994-995 (D.C.Cir.1975).
 
 
 30
 Unless the exemption permits the price differential embodied in FTCC's tariff, it would have no meaning whatever. Exempt carriers need not treat their domestic and international operations as separate entities and need not provide interconnection to their own "separate" affiliate on the same terms as to their competitors. 47 U.S.C. Sec. 222(c)(1). Unless a carrier is permitted to take advantage of its exempt status by charging an end-to-end rate that, in effect, differentiates between through and intercarrier customers for the cost of the international leg of the transmission, the exemption would have no substantive effect at all. The very objective of Section 222 was to prevent the large companies from leveraging their established networks in one market into dominance of another. In the case of an IRC the easiest mechanism for accomplishing this disfavored objective was to charge a single unified rate for end-to-end calls that was less than the total of its international rate and the rate charged by a domestic competitor to reach its overseas switch. The most elemental reasoning suggests that exempting small carriers from the mechanism designed to thwart this practice necessarily implies that small carriers can engage in this practice. Put another way, Congress required carriers with a significant share of the market to unbundle domestic and international rates and to charge their subscribers and, indirectly, those of their competitors equal rates to interconnect their lines. Because small carriers are exempt from these provisions, it follows that they need neither unbundle nor charge rates that, when passed on to the consumer, result in equal rates for single carrier and inter-carrier transmissions.
 
 
 31
 RCA's response to the suggestion that its position would render the small carrier exemption a nullity is entirely unconvincing. It maintains first that exempting FTCC from Section 222's strictures spares it "the practical burdens of maintaining separate domestic and international operations." Brief for petitioner at 24. But Section 222 simply does not impose any significant burdens on carriers. The statutory wall between a record carrier's international and domestic operations is entirely fictitious. Provided the carrier unbundles its rates, the separation requirement is satisfied. See House Report at 10. It strains credulity beyond the breaking point to suggest that Congress enacted the exemption solely to excuse small carriers from the de minimis accounting procedures necessary to implement the otherwise wholly imaginary separation of an international carrier from its corporate sibling.
 
 
 32
 Second, at oral argument RCA suggested that its construction of the Small Carrier Exemption does not deprive that section of all vitality because it affords exempt carriers a "modest degree of additional flexibility" in the composition (as opposed to the total amount) of their rates. In other words, though FTCC may not charge its customers a lower end-to-end rate than that ultimately paid by subscribers who make inter-carrier calls using FTCC's international line, FTCC has some play in the amount charged for each of the two segments of the transmission. Thus, as long as the end-to-end price for both sets of customers is identical, the exempt carrier may, for example, charge its customers less for the international component of the transmission than it charges to interconnect a call originating on the network of a competitor. To compensate for the differential, RCA suggests, FTCC would have to adjust the rate it charges its customers for the domestic segment of the transmission.
 
 
 33
 This argument follows from the distinction RCA draws between customer tariffs and interconnection tariffs. The former is the actual charge to the customer for sending messages. The latter is the rate that one carrier charges another for completing a call originating on another network. RCA maintains that the small carrier exemption spares FTCC from the requirement that its interconnection tariffs be equal, but has no bearing at all on customer tariffs such as that at issue in this petition.
 
 
 34
 Merely to state this argument is to reveal its incoherence. RCA suggests that its construction does not render the Small Carrier Exemption a nullity because an exempt carrier may discriminate to its heart's desire on its interconnection tariffs, so long as its through customers and those who use a competitor's network to or from its switch pay the same total rate. But unless the small carrier can pass on to its customers the difference in price between, for example, its charge for interconnection to its international line by another carrier and its charge for the use of that line by its own domestic subscribers, the exemption will have had no effect at all, much less its intended effect. Moreover, the corollary suggestion that the exemption gives a small carrier such as FTCC the "flexibility" to play with the composition (but not the total amount) of its rates presupposes precisely the kind of unbundling from which small carriers are indisputably exempt.
 
 
 35
 In short, RCA's interpretation of the Small Carrier Exemption would deprive it of all substantive effect, a result self evidently contrary to Congress' intent. Nevertheless, RCA invites us to look beyond the face of the statute to two snippets of legislative history which, it believes, decisively demonstrate that the exemption does not allow the price differential embodied in FTCC's tariff. A single statement in the House Report, House Report at 7, and another on the Senate floor, 127 Cong.Rec. S15502 (daily ed. December 16, 1981) (remarks of Senator Cannon), suggest that the RCCA repealed only the original Section 222 and was not intended to override any other provision of the Communications Act of 1934. Thus, RCA suggests, reading the Small Carrier Exemption to permit a tariff otherwise proscribed by Section 202(a) violates Congress' express will.
 
 
 36
 Even were we to assume that an examination of extrinsic evidence is appropriate despite the statute's clear intent, the legislative history provides no support for RCA's otherwise untenable position. The bill that emerged from the House Energy and Commerce Committee did not even contain the Small Carrier Exemption. Compare 47 U.S.C. Sec. 222(c)(1)(B) with House Report at 22 (the bill approved by the Committee). Thus the statement in the accompanying report has no bearing whatever on the relationship between the exemption and the rest of the Act. RCA's reliance on an isolated comment on the Senate floor, which in any case is entitled to little weight, Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); Casteneda-Gonzalez v. I&NS, 564 F.2d 417, 424 (D.C.Cir.1977) is equally unconvincing. When read in context, the speaker was merely suggesting that under the original act the Commission enjoyed many of the same powers conferred anew in the RCCA.
 
 IV. CONCLUSION
 
 37
 RCA has failed to demonstrate that the Small Carrier Exemption would have any substantive force under its view of the statute. Because we refuse to endorse an interpretation that would effectively nullify the exemption and because we find the FCC's position fully consonant with congressional intent, we affirm.[16]
 
 
 38
 Affirmed.
 
 
 
 [1]
 Under the regulatory framework that developed the International Record Carriers (IRCs) did participate in the domestic market in certain minimal respects. For example, the IRCs were authorized to and in fact did independently pick up and deliver messages in the limited number of "gateway" cities approved by the Commission. 47 U.S.C. Sec. 222(a)(5); Western Union International, Inc. v. FCC, 568 F.2d 1012-1014 (2d Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978). In industry parlance, a gateway is the locale that serves as the point of entry or exit of international transmissions. Customers could also reach an IRC over ordinary telephone lines or through a private line. International Record Carriers' Scope of Operations, 76 FCC2d 115, 138 (1980). For the typical transmission, however, Western Union provided the landline haul between the "hinterland" (a domestic point outside the gateway) and the international switch. See generally ITT World Communications, Inc. v. FCC, 635 F.2d 32, 37 (2d Cir.1980); International Record Carriers' Scope of Operations, 38 FCC2d 543, 545 (1972)
 
 
 [2]
 Brief for intervenor FTC Communications, Inc. at 5
 
 
 [3]
 Freidan, International Telecommunications and the Federal Communications Commission, 21 COLUM. J. TRANSNAT'L L. 423, 468 (1983)
 
 
 [4]
 Another provision is designed to assure equitable allocation of inbound transmissions in circumstances in which the foreign government is in a position to directly affect the domestic record carrier industry. 47 U.S.C. Sec. 222(c)(1)(A)(ii)
 
 
 [5]
 In relevant part the Record Carrier Competition Act of 1981 (RCCA) reads:
 (1)(A)(i) * * * [T]he Commission shall require each record carrier to make available to any other record carrier, upon reasonable request, full interconnection with any facility operated by such record carrier * * *.
 * * *
 (B) The Commission shall require that--
 (i) if any record carrier engages both in the offering for hire of domestic record communications services and in the offering for hire of international record communications services, then such record carrier shall be treated as a separate domestic record carrier and a separate international record carrier for purposes of administering interconnection requirements;
 (ii) in any case in which such separate domestic record carrier furnishes interconnection to such separate international record carrier, any interconnection which such separate domestic record carrier furnishes to other international record carriers shall be (I) equal in type and quality; and (II) made available at the same rates and upon the same terms and conditions; and
 (iii) in any case in which such separate international record carrier furnishes interconnection to such separate domestic record carrier, any interconnection which such separate international record carrier furnishes to other domestic record carriers shall be (I) equal in type and quality; and (II) made available at the same rates and upon the same terms and conditions.
 The requirements of clauses (i), (ii), and (iii) shall not apply to a record carrier if such record carrier does not have a significant share of the market for record communications services.
 47 U.S.C. Sec. 222(c)(1).
 
 
 [6]
 The details in the example set out in text are for purposes of illustration only and are entirely hypothetical. In addition, in the inter-carrier example (and throughout the opinion) no effort is made to indicate accurately which carrier actually bills the customer. See Western Union Telegraph Co. v. FCC, 729 F.2d 811, 814-815 (D.C.Cir.1984)
 
 
 [7]
 See generally International Record Carriers' Scope of Operations, 76 FCC2d 115 (1980)
 
 
 [8]
 For example, a Western Union subscriber would dial RCA, which, in turn, would complete the call to the overseas destination. In contrast, an RCA subscriber, whose terminal typically is connected to RCA's international switch by a permanent dedicated line, could reach the international line directly
 
 
 [9]
 House Report at 10
 
 
 [10]
 Interconnection Arrangements, 89 FCC2d 928, 956 (1982)
 
 
 [11]
 The Common Carrier Bureau noted that RCA had objected to FTCC's tariff not only on the ground that it was illegally discriminatory under 47 U.S.C. Sec. 202(a), but also on the ground that it was unlawful under Sec. 201(b), which requires that tariffs be "just and reasonable." FTC Communications, Inc., Transmittal No. 130 (Mimeo No. 4924), JA 74. The Sec. 201(b) argument was not vigorously pressed before the Common Carrier Bureau or the Commission and was discussed by neither. Nor is it raised in this petition. Accordingly, we do not reach any questions concerning the relationship between Sec. 201(b) and the Small Carrier Exemption. We note, however, that the FCC has represented that under its view of the Act it may still police rates charged by small carriers if "unjust or unreasonable" within the meaning of Sec. 201(b). Brief for respondents at 29 n. 22
 
 
 [12]
 The FCC contends that its refusal to reject the FTCC tariff is not a reviewable order. See Papago Tribal Utility Authority v. FERC, 628 F.2d 235 (D.C.Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). However, the Commission's simultaneous denial of RCA's complaint, which was premised on arguments identical to those raised in the petition to reject, is clearly reviewable. Thus we need not consider whether, standing alone, denial of the petition to reject would have been ripe for judicial review
 
 
 [13]
 In text the opinion stated:
 To avoid further confusion, we shall prescribe the following statement which each IRC must include in its tariff immediately after its table of its own charges:
 Subscribers to service offered by other record carriers may initiate an international telex transmission on the other carrier's network and designate the Company as the international record carrier over whose facilities the transmission will be routed. In these instances, the Company will bill the customer and collect the appropriate total end-to-end charge. The other record carriers' charge for the domestic component, as shown in the following tariffs, shall aply [sic] in lieu of the Company's domestic charge.[14]
 Prescription Order, 91 FCC2d at 488-489 (footnote 13 omitted).
 Footnote 14 stated: "In FTC's tariff, the term 'in lieu of the Company's domestic charge' should be replaced with 'in addition to the charges specified in Column (b) of Section D.2.' " Id. at 489.
 
 
 [14]
 See State of Montana v. Clark, 749 F.2d 740, 744 (D.C.Cir.1984) (Natural Resources Defense Council v. NRC "merely holds that a protestant, who could have but did not seek review, may not create the basis for a reviewable order by unilaterally petitioning for repeal or amendment of a regulation")
 
 
 [15]
 See note 13 supra
 
 
 [16]
 RCA also maintains that the FCC's explanation of its legal conclusion was so cursory as to render it "arbitrary and capricious." 5 U.S.C. Sec. 706 (1982). We disagree. The Commission's analysis and that of its delegate, the Common Carrier Bureau, although brief, fully comported with the demands of reasoned decisionmaking